**Alan L. FITZGIBBON, Plaintiff,**

v.

**CENTRAL INTELLIGENCE AGENCY, et al., Defendants.**

**Civ. A. No. 79–0956.**

United States District Court, District of Columbia.

Nov. 10, 1983.

Stephen P. Doyle, Washington, D.C., for plaintiff.

Scott T. Kragie, Asst. U.S. Atty., Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiff is an historian researching the disappearance and assumed death in 1956 of Jesus de Galindez, a Basque exile who was then living in New York City and teaching at Columbia University. Galindez was also the United States delegate of the Basque Government-in-exile, which was headquartered in Paris; he was an FBI informant, giving information on Spanish exile activities in New York City; and he was a public critic of the regime of Rafael Trujillo, head of state of the Dominican Republic until 1961.[1] The disappearance of Galindez, who was last seen on a March evening after a student dropped him off at a Manhattan subway station, was alleged by colleagues of Galindez and political commentors to have been engineered by Trujillo and executed with the unwitting aid of an American pilot, Gerald Murphy, whose body was subsequently found in the Dominican Republic.[2]

The Galindez incident and its aftermath received extensive publicity, highlighting as they did the controversial and ambivalent relationship between the United States and the Trujillo regime, which was opposed to the Soviet Union but at the same time had a reputation for repression. A number of investigations were carried out to determine what had happened to Galindez and Murphy. The Dominican Republic hired Morris Ernst, a prominent New York City lawyer, to investigate the case and, it presumably was hoped by his client, to establish that country's lack of culpability.[3] Meanwhile, the New York City Police Department, the Federal Bureau of Investigation, the Central Intelligence Agency, and a

1. Before his disappearance, Galindez published several articles denouncing Trujillo in Latin American periodicals. His Ph.D. dissertation, in manuscript form at the time of his disappearance and published several months later, was entitled, "The Era of Trujillo." Trujillo was assassinated in 1961 by Dominicans opposed to his regime.

2. Not all public attention was focused on Galindez's role as critic of Trujillo. In 1961 columnist Drew Pearson reported an allegation that Galindez had been paid $1 million by the CIA to operate an underground operation in Spain with the goal of overthrowing Francisco Franco, chief of state of that country.

3. The Trujillo regime has contended that Galindez's disappearance was engineered by communists in order to damage the reputation of Trujillo.

federal grand jury in Washington, D.C. investigated the case in one way or another, as late as 1971, sometimes jointly, sometimes independently. Despite all this effort, the disappearance of Galindez and the role of Murphy remain a public mystery.

## I

### *General*

Having devoted years to solving that mystery through private interviews and other forms of research, plaintiff[4] brought this lawsuit in 1979 to follow up on requests for government records that he had filed with the CIA and FBI under the Freedom of Information Act, 5 U.S.C. § 552(b). Plaintiff challenged the substantial deletions made in the documents which the government identified as relevant; he also claimed that the CIA's search had not been adequate.[5] In February 1981, the Court denied defendants' motion for partial summary judgment on the issue of the applicability of the exemptions they had invoked.[6]

ordering the submission of limited *in camera* affidavits which would explain in detail the agencies' various rationales for not releasing all relevant documents in their files.[7] The Court singled out 89 documents that were to be addressed in the affidavits.

Subsequently, finding that it could not fulfill its statutory responsibility to conduct a *de novo* review[8] on the basis of the limited *in camera* affidavits, the Court ordered the CIA and FBI in November 1981 to submit *in camera* affidavits pertaining to all of the records except only the 78 documents no longer contested by plaintiff and the one document in the (b)(1) category on which the Court was able to rule on the basis of the limited affidavits.[9] The defendants were ordered to submit under seal the unabridged versions of every contested document, not because the agencies' good faith had been controverted, but "in order that the Court may be able to monitor the agencies' determinations in accordance with the Court's guidelines." Memorandum of November 16, slip. op. at 2 n. 2.[10]

---

4. In affidavits filed with the Court, several historians state that plaintiff is the world's foremost expert on the Galindez affair. In several of its pleadings, the CIA agrees with that assessment.

5. Of 551 documents the CIA identified as related to the Galindez affair, the CIA turned over only 21 in their entirety. The remainder were released in expurgated form or withheld. The FBI, on the other hand, operating under a directive of the Attorney General that the case was historical and that maximum disclosure should be made, has winnowed down its claimed exceptions to parts of 13 documents and the full text of only one. (The Court infers from the latest filings by the FBI that the agency withdraws all previous exemption claims not supported in the most recent *in camera* affidavits.) However, the FBI referred to the CIA 376 documents that contained information originating with the CIA, which the CIA then "sanitized." Some of these were duplicates of documents the CIA found in its files, and others were not. Thus, it is difficult to state precisely how many FBI documents were released to plaintiff in their entirety. Plaintiff has contended throughout this litigation, however, that the FBI was much more forthcoming with its records than was the CIA, and this is borne out by the available numbers. The CIA does not contest this assessment, but offers reasons, such as the greater sensitivity attached to being a CIA source than an FBI source, why it should be so.

6. The exemptions involving the CIA documents are (b)(1), protecting classified information for national security or foreign policy reasons; (b)(3), incorporating the statute which requires the CIA director to protect against "the unauthorized disclosure of sources and methods"; and (b)(6), guarding against invasions of privacy. The FBI invokes (b)(1) and (b)(7), protecting certain information gathered in the course of investigations.

7. The motion did not address the separate question of the adequacy of the CIA's document search.

8. 5 U.S.C. § 552(a)(4)(B) provides that

the court shall determine the matter de novo ... and the burden is on the agency to sustain its action.

9. This document was #113, a one-page handwritten note dated Sept. 20, 1956. The Court upheld the FBI deletion under exemption (b)(1). It is one of only four documents for which the FBI, independently of the CIA, invoked exemption (b)(1).

10. One of the primary legal questions referred to in the Court's prior Memorandum—whether a forced waiver of an exemption claim occurs if the information withheld by the government is publicly known, or is at least known or suspected by plaintiff—has largely been answered by a

The CIA complied by submitting 14 volumes of documents and an *in camera* explanatory affidavit executed by Louis Dube ("Dube affidavit"), all of which the Court has reviewed. The documents were arranged in the following manner:

| | |
|---|---|
| Category A, Collection 1 | -- Liaison w/foreign intell. service |
| Category B, Collection 2 | -- CIA station locations |
| Category D, Collection 3 | -- Intelligence sources |
| Collection 4 | |
| Collection 5 | |
| Collection 6 | |
| Category E, Collection 7 | -- CIA operations and methods |
| Collection 8 | -- CIA cover |
| Category F, Collection 9 | -- Privacy material |
| Category M, Collection 10 | -- Miscellaneous |
| Collection 11 | |
| Collection 12 | -- Liaison |
| Collection 13 | |
| Collection 14 | -- Employee identities, internal organization information |

Despite the bulk of the submissions, the CIA's justifications for a number of the withholdings still suffer from a lack of specificity that is common and not always inappropriate in these "national security" FOIA cases. See, *e.g., Ray v. Turner*, 587 F.2d 1187, 1211 (D.C.Cir.1978) (Wright, J., concurring) (there may be cases where "affidavits sufficient to allow *de novo* review would reveal the very information that the agency claims is exempt"). Lack of specificity is not inevitable in all respects, however, particularly at this advanced stage in the litigation when all of the governments' submissions are *in camera*, as the most recent filings by the FBI demonstrate. The FBI submitted two affidavits, one by Peter Kellen explaining the (b)(1) deletions, and one by John Phillips explaining the (b)(7) withholdings. Both describe with considerable precision the nexus between the material deleted and the alleged harm that might flow from disclosure. To be sure, the FBI's task was an easier one

since it now claims exemptions for only 14 documents while the CIA claims them for 530. Yet there is not one CIA narrative that rivals in specificity all of those of the FBI. Since CIA withholdings account for the vast majority in the case, this Opinion is primarily devoted to defendant CIA rather than to defendant FBI. Unless otherwise specified, therefore, "the government" and "the agency" refer to the CIA.

Most of the CIA deletions are defended on the basis of the (b)(1) national security exemption. Where adequate explanations are provided or where the possibility of identifiable harm to the national security is self-evident from *in camera* review, the Court upholds the deletions. With respect to a number of deletions, however, the CIA's explanations lack the specificity required under the Act and are not credible. This lack of specificity falls in the main into two categories: (1) paucity of explanation why palpable harm to the national defense or foreign policy of the United States is likely to occur if information about a particular operation or relationship were released, and (2) lack of explanation how the deleted words—either alone or in context—actually communicate the allegedly sensitive information.

Some paucity in the first respect is not surprising since the CIA cannot predict the future, and the only question that can legitimately be asked is "whether the predicted danger is a reasonable expectation." *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir.1980). However, with respect to the second inadequacy—which surfaced when the Court, having resolved the first inquiry in the CIA's favor, next inquired whether a given deletion actually fell into the qualifying category—little, if any, speculation is needed, yet the affidavits often failed to provide any nexus between deleted material and the secret the material supposedly

recent decision of the Court of Appeals for this Circuit. See *Afshar v. Department of State*, 702 F.2d 1125 (D.C.Cir.1983). Only one category of deletions, discussed in section IV *infra*, meets the stringent three-pronged test laid down in *Afshar* and may therefore be released to plain-

tiff on the basis of prior disclosure. With respect to the remainder of the deletions which plaintiff has accurately identified, plaintiff's knowledge is irrelevant under *Afshar* to the question whether the material is properly withheld under FOIA.

would expose.[11] It is where deletions are unexplained [12] and the expurgations either appear unrelated to the stated category or fall within it only if the category is defined in an impermissibly broad fashion (see *Vaughn v. Rosen,* 484 F.2d 820, 823 (D.C. Cir.1971)) the Court orders disclosure of the deleted matter.

The Court now turns to a category-by-category examination of the deletions and their justifiability.[13]

## II

### *Privacy*

█ The Court has previously ruled that the CIA properly invoked exemption (b)(6) [14] to withhold documents containing information related to an individual's medical condition or sexual habits because this information is "highly personal or intimate in nature," *Board of Trade v. Commodity Futures Trading Commission,* 627 F.2d 392, 398 (D.C.Cir.1980), and because the individuals' substantial privacy interests were not outweighed by the public interest in disclosure. Memorandum of November 16, 1981, at 8–9.[15] At the same time, the Court held that exemption (b)(6) had been

invoked improperly to shield the "identity of persons involved in the Galindez-Murphy affair, such as names contained in Murphy's notes, the identities of persons who allegedly witnessed Galindez's death, and the identities of associates of other persons prominent in these events." *Id.* at 9. Such information, the Court found, was not personal in nature, concerned the individuals' interaction with the CIA, and was subject to a strong public interest in disclosure. *Id.* at 10.[16]

In compliance with the Court's previous privacy rulings, the CIA submitted in this round one relatively slender volume containing documents whose deletions are based on exemption (b)(6) but which were not subject to the Court's previous *in camera* review.[17] Having reviewed the full text versions of the documents in this volume, the Court finds that the "F" deletions in documents 236 and S–17 properly fall under exemption (b)(6) because they involve medical and sexual details. The following documents fall into the second category identified *supra* at p. 711, and the material withheld on privacy grounds must there-

**11.** As is evident from its November 1981 opinion the Court had expected to resolve most of the case by evaluating simply the nature of the categories of deletions. It is because of the generality of the affidavits that a more extensive *in camera* review of the actual deletions than had been anticipated became necessary. See *Ray v. Turner, supra,* 587 F.2d at 1197 (D.C.Cir. 1978) ("The reviewing court should not be required to speculate on the precise relationship between each exemption claim and the contents of the specific document. The district judge is not called upon to take on the role of censor—going through a line-by-line analysis for each document and removing particular words. If, however, the problematic material appears in a particular place or places that can be manageably identified, indexing is not to be bypassed because it is something of a chore.").

**12.** The government has had ample opportunity to provide explanations through several sets of briefs and affidavits.

**13.** In November 1981, the Court ordered the CIA to release to plaintiff some of the deleted material in the privacy category. The CIA postponed its "resanitation" of these documents un-

til after the Court's final review and decision. All material improperly withheld shall therefore be released at once following the issuance of this Opinion. Should defendants appeal any portions of this ruling, they shall make available to plaintiff all material not subject to the appeal.

**14.** Exemption (b)(6) exempts any matters that are found in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

**15.** Deletions in five documents fell into this category: Nos. 135, 138, 195, 248, 396.

**16.** Deletions in eleven documents fell into this category: Nos. 158, 162, 163, 212, 238, 375, 377, 385, 536, F13, F363.

**17.** Some deletions justified on the basis of (b)(6) were made in documents not collected in the privacy volume because the CIA justifies other, more substantial deletions in those documents on grounds other than privacy. The Court notes its rulings on those "F" deletions in the Appendix.

fore be released: Nos. 146, 107, 197, 213, 240, 241, 242, 492, F359.[18]

## III

### Relationships with Foreign Intelligence Services

The CIA has submitted three volumes of documents classified[19] as "secret" or "confidential" the deletions in which are said by the CIA to be necessary to protect its relationships with intelligence services of foreign governments. (Collections 1, 12, 13). The Court previously ruled that the CIA could properly invoke exemption (b)(1)[20] to protect its relationships with foreign intelligence services to the extent that official disclosure of such relationships would "inhibit its ability to deal with these agencies in the future and therefore harm the national security."[21] Memorandum of November 16, 1981, at 7.

As set forth in the CIA's affidavit, to which the Court must and does accord substantial weight, there are several reasons for exempting from the FOIA information that would officially confirm cooperation between the CIA and foreign intelligence services. First, there may be bilateral consequences: to the extent that the CIA is unpopular in the country whose intelligence service worked in concert with the CIA, official confirmation of this partnership might discredit that government with its public and place pressure on the foreign government to cease any current cooperation with the CIA, or to take diplomatic or other action. See, e.g., Afshar v. Department of State, supra, 702 F.2d at 1134 (D.C.Cir.1983); Phillippi v. CIA, 655 F.2d 1325, 1332–33 (D.C.Cir.1981). Second, there may be multilateral consequences: to the extent that the precise nature of the cooperation was previously unknown or unsuspected by other governments, their public or private posture toward the formerly cooperating government might change, possibly with international repercussions. Cf. Gardels v. CIA, 689 F.2d 1100, 1104 (D.C.Cir.1982) ("foreign intelligence agencies [might] 'try to zero in and identify specifically what were the nature of [the] relationships or with whom the relationship were' ").

■ The Court is satisfied, therefore, that as a *category*, information exposing sensitive relationships with foreign intelligence services, even if they occurred in the

---

**18.** The CIA has failed to provide the full text version of document 519. Because the agency therefore did not meet its burden with respect to this document, the withheld "F" material must be released. In addition, the Court stated in its prior Memorandum that it could not make a determination regarding deletions in Nos. 386 and F366 because the affidavits were not sufficiently detailed; and it stated that it would make its decision on the basis of the unexpurgated documents. However, these documents are not flagged by the CIA, and they have not been found by the Court in any of the collections. The CIA has thus failed to meet its burden with respect to these documents, and the withheld matter in them must accordingly be released.

**19.** Executive Order No. 12,065, which took effect on December 1, 1978, governed classification of national security information at the time when the documents at issue in this case were reviewed for declassification by CIA officials. Although the order was superseded effective August 1, 1982 by Executive Order No. 12,356, 50 U.S.C. § 401 note, it has been held that

The Executive Order in effect at the time the classifying official acted states the relevant criteria for purposes of determining whether Exemption 1 properly was invoked.

Lesar v. United States Department of Justice, 636 F.2d 472, 480 (D.C.Cir.1980). It should be noted that nothing stated in Afshar v. Department of State, supra, 702 F.2d at 1136, is to the contrary.

**20.** Exemption (b)(1) protects from disclosure any matters that are

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1).

**21.** Under the criteria of Executive Order 12,065, information is not to be classified "confidential" unless its disclosure "reasonably could be expected to cause at least identifiable damage to the national security." The "secret" classification is available only for information the disclosure of which reasonably could be expected to cause "serious damage" to the national security. Executive Order No. 12,065, 50 U.S.C. § 401 (1981·Supp.).

past,[22] is properly classified pursuant to the criteria of Executive Order 12,065 and properly withheld from plaintiff under exemption (b)(1). The Court's responsibilities under FOIA do not end here, however. It must also be satisfied that the deletions said by the CIA to be included in a particular category "logically fall[ ] within the claimed exemption." *Lesar v. United States Department of Justice,* 636 F.2d 472, 481 (D.C.Cir.1980). The Court has therefore reviewed the documents in conjunction with the Dube affidavit with this standard in mind.[23]

While the bulk of the deleted material in Collections 1, 12, and 13 is information that would "inhibit the [CIA's] ability to deal with [foreign intelligence services] in the future" (see *supra*) and was on that basis ruled by the Court to be exempt from disclosure, some of it does not concern intelligence liaisons between the United States and another government. Rather, it simply concerns nonsensitive contacts between the CIA and foreign or domestic officials, and the reporting of information about third parties.

For example, since Galindez had been the New York delegate of the Paris-based Basque government-in-exile, representatives of that body were understandably anxious upon his disappearance to regain possession of the Basque government files that had been under Galindez's control and were located in the small Basque government office in New York City which had also served as Galindez's residence. See, *e.g.,* released portions of document 52. Yet because Galindez was a missing person within the jurisdiction of the New York Police Department, there was considerable investigative interest by that department in Galindez' personal effects. In fact, the Police Department had seized the files which the Basque government sought to recover.

■ The CIA acted as an intermediary between several Basque officials and the department to help the Basques obtain the files, a role which prompted its agents to contact various New York officials. The CIA has made deletions obscuring the intermediary role it played in this aspect of the Galindez affair even though this was a purely domestic role and had nothing to do with the trading of information or the planning and conducting of joint operations between U.S. and foreign intelligence services. The deletions made to protect this type of information appear to be tailored more to prevent public criticism over the CIA's past actions in the United States itself (see *Sims v. CIA,* 709 F.2d 95, 101 (D.C.Cir.1983) (*Sims II*)) than to guard against disclosures that may "inhibit its ability to deal with [foreign intelligence services] in the future." [24]

---

**22.** Relationships with foreign intelligence services are to be distinguished from past individual intelligence sources insofar as the passage of time is concerned. When it is officially confirmed that a foreign government actively worked with the CIA, the stigma which that country's citizens might attach to their government is far greater than if it is merely confirmed that the CIA had a relationship with an occasional individual in the country. The government could properly plead ignorance of the latter but certainly not of the former. Furthermore, although the cooperation in question dates back over 25 years, the current government is likely to suffer the effects of a current revelation because it is the only available target. Compare section V *infra.* In ruling on an exemption (b)(1) claim the Court is required to conduct a *de novo* review to determine "whether unauthorized disclosure of the materials reasonably could be expected to cause the requisite harm." *Lesar v. United States Department of Justice, supra,* 636 F.2d at 481.

**23.** The Court also examined whether any of the deleted information had been publicly disclosed within the meaning of *Afshar, supra.* Although plaintiff, in his affidavits, correctly identifies many CIA activities in this category, he cannot point to any prior *official* disclosure of this information and thus his claim of waiver due to prior disclosure must fail.

**24.** Certainly no New York official or police officer is a foreign intelligence service. The limited assistance to Basque officials with respect to a domestic request cannot be regarded as a relationship with a foreign intelligence service. Such assistance would presumably be granted by the United States to many foreign groups or individuals. Indeed, in one sense the report of this assistance provides an innocent explanation to events to which some have attached far more sinister ramifications.

■ Another type of overinclusive withholding in this category occurred where the CIA deleted sentences and paragraphs of investigative material pertaining to the Galindez case, or to Latin American events more generally, on the basis that the information was acquired from, or as a result of a liaison with, a foreign intelligence service even where the sentence or paragraph does not, either explicitly or implicitly disclose the liaison. In such cases, for all the reader knows, the information could as readily have come from a periodical, newspaper, FBI file, confidential source, or CIA employee as from a specific foreign intelligence service. Where the CIA has been overinclusive in the manner just described, the Court will order the withheld material released. The Appendix to this Opinion contains the Court's rulings on withholdings in this category.

## IV

### CIA Station Locations

The CIA justifies a number of deletions under both exemption (b)(1) and exemption (b)(3) [25] on the basis that the deleted material would identify the past location by city and nation of several CIA stations, confirm that there was a CIA presence in these countries at the time of Galindez's disappearance and thus, it is argued, harm the national security.

The Court previously held that the exemptions may not be invoked to shield former CIA station locations.[26] The CIA has since continued to press its claim, and the Court has analyzed the issue once again and in more detail. Upon such examination, it has decided to uphold the government's claim with respect to most of the station locations, and to deny it with respect to but one of them.

■ First. It is generally accepted that the CIA need not release material that would disclose the location of *current* CIA installations,[27] but it has apparently not previously been decided whether the agency may properly withhold information that would reveal installations extant in the past. However, it would appear that such a revelation would suggest to most people that there continues to be a CIA station at the same location. On this basis, the CIA quite correctly argues that if an installation's former location were revealed, a "hostile country ... may take a variety of measures against the United States ranging from diplomatic protest to military action." Dube affidavit at 15. While this is not necessarily true with respect to all countries, it is likely to be true with regard to some of them.[28]

Moreover, most of these deletions appear in the "to" and "from" greeting sections of internal memoranda.[29] The gain to plaintiff from such information would be minimal; yet the damage to the national securi-

---

**25.** Exemption (b)(3) protects matters that are specifically exempted from disclosure by statute ..., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3). The Director of Central Intelligence is statutorily "responsible for protecting intelligence sources and methods from unauthorized disclosure," 50 U.S.C. §§ 403(d)(3), 403g, and the provisions of that law have been held to apply to FOIA under exemption (b)(3). *Gardels v. CIA, supra,* 689 F.2d at 1103 (D.C.Cir.1982); *Sims v. CIA,* 642 F.2d 562, 568 (D.C.Cir.1980) (*Sims I*); *Goland v. CIA,* 607 F.2d 339, 349–50 (D.C.Cir.1978).

**26.** The Court has stated

[t]he CIA has presented no compelling argument that revelation of the bare fact that it had agents present in a particular country twenty-five years ago would affect the security of the United States today.

November 16, 1981, slip op. at 8.

**27.** See, *e.g., Church of Scientology v. Turner,* 662 F.2d 784, 785, 786 n. 4 (D.C.Cir.1980); *Shaw v. Department of State,* 559 F.Supp. 1053, 1066–67 (D.D.C.1983).

**28.** See also, *Military Audit Project v. Casey,* 656 F.2d 724 (D.C.Cir.1981).

**29.** Additionally, there are a number of documents in which the word "station" or the phrase "Chief of Station," the acronym for which is COS, was deleted.

ty could be considerable. For that reason, the deletions will be upheld.

■ Second. The situation is different with respect to references to the CIA's previous station in Santo Domingo, the capital of the Dominican Republic (known as Ciudad Trujillo during the time these documents were generated). The fact that a CIA station existed in the Dominican Republic until 1961 is publicly known within the meaning of *Afshar v. Department of State, supra.* In that case, the Court of Appeals held that an agency's reliance on the national security or "source and method" exemptions would be undercut if the information is already publicly known. Public knowledge in this sense would be established if the plaintiff could show that the information (1) already in the public domain is as specific as that which would be released through FOIA, (2) relates to the same time period as that which would be released, and (3) has been the result of an "official and documented disclosure." 702 F.2d at 1133.

In 1975 the U.S. Senate published a report on "Alleged Assassination Plots Involving Foreign Leaders" resulting from hearings into the CIA's past involvement in Latin American governmental affairs that were conducted by a subcommittee chaired by Senator Frank Church. In the section devoted to American involvement in events leading to Trujillo's assassination in 1961, the report makes numerous references to "the CIA Station in the Dominican capital" during the years 1960 and 1961, and it frequently cites and quotes from cables from "Station to HQ [headquarters]."

Nonetheless, the CIA has withheld from plaintiff in this lawsuit exactly the same information contained in the same sorts of communications.[30]

In 1975 Congress weighed the public interest in disclosure against the potential harm to national security with respect to disclosure of a CIA presence in the Dominican Republic until Trujillo's assassination. In fact, in the opening pages of its report, the Select Committee to Study Governmental Operations with respect to Intelligence Activities stated that

> We believe that the public is entitled to know what instrumentalities of their Government have done.... We reject any contention that the facts disclosed in this report should be kept secret because they are embarrassing to the United States. Despite the temporary injury to our national reputation, the Committee believes that foreign peoples will, upon sober reflection, respect the United States for keeping faith with its democratic ideal....

Report at 2.

The CIA's implication that release of the words "Ciudad Trujillo" and "COS" in the documents sought by plaintiff would cause more harm to the national security than the detailed revelations made by the Senate concerning the CIA's role as liaison between the United States and the dissidents who plotted Trujillo's overthrow is simply not credible.

For the reasons stated, the deletions with respect to the CIA's station installations are sustained with the exception of references to the installation in Ciudad Trujillo

**30.** Indeed, the Senate report even divulged the identity of the Chief of Station in Santo Domingo.

The Court of Appeals stated in *Afshar* that the prior disclosure waiver would not operate on information pertaining to a time period *later* than the date of the publicly documented information. 702 F.2d at 1133. In this case most of the documents that would identify the Santo Domingo station were generated in 1956, 1957, and 1958, *predating* the time period that was the focus of the Senate report, the years 1960 and 1961. There is no reason grounded either in the past or the present for distinguishing between

the documents that the Senate used to confirm a CIA presence in the Dominican Republic in 1960 and 1961 and those in this case that would confirm a presence dated to 1956: the government in power in the Dominican Republic and the nature of the relationship between the United States and that country were the same. Since it is already known that the CIA had an installation in the Dominican Republic for the last two years of Trujillo's rule, no greater embarrassment either to the United States or to the Dominican Republic would follow from confirming that the presence encompassed several prior years as well.

through May 1961, the date of Trujillo's death.[31]

## V

### Sources

Four of the fourteen volumes of documents (Collections 3, 4, 5 and 6) submitted *in camera* by the government contain materials which have been withheld in part or in full on the justification that the information would reveal the identities of intelligence sources.

As indicated *supra*, the Director of Central Intelligence is statutorily "responsible for protecting intelligence sources and methods from unauthorized disclosure," 50 U.S.C. §§ 403(d)(3), 403g, and this provision has been held to apply to FOIA under exemption (b)(3). In addition, exemption (b)(1) permits the withholding of properly classified information that "concerns ... intelligence ... sources" the unauthorized disclosure of which "reasonably could be expected to cause at least identifiable damage to the national security." See note 21 *supra*.

█ A. It is appropriate at this juncture to summarize first the case law regarding the application of these exemptions. For purposes of applying sections 403(d)(3) and 403g (exemption 3), an intelligence source is

a person or institution that provides, has provided, or has been engaged to provide the CIA with information of a kind the Agency needs to perform its intelligence function effectively, yet could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it.

*Sims v. CIA*, 642 F.2d 562, 571 (D.C.Cir. 1980) (*Sims I*).[32]

█ To apply the exemption, "the first thing the trial court should do is define 'the class or "kind" of information involved,'" to be followed by an assessment of the "likelihood that disclosure would undermine CIA access to information of *that kind.*"[33] The emphasis throughout is on the "practical necessity of secrecy" (*Sims I*, 642 F.2d at 571), in order to distinguish legitimate claims from a desire for secrecy that "derive[s] principally from fear of a public outcry resulting from revelation of the details of [the CIA's] past conduct." *Sims II*, 709 F.2d at 101.[34] Moreover, neither a promise of confidentiality to a particular informant, nor the fact that information was secured in the course of covert activity, is "dispositive of the question whether a given informant qualifies as an 'intelligence source'"; these facts are merely evidence to be considered by the trial court. *Sims II*, 709 F.2d at 98, 100–01.[35]

---

**31.** These deletions are marked by the letter code "B." Documents whose primary deletions fall into this category have been aggregated into Collection 2. However, "B" deletions appear in many documents in other volumes. The Court's ruling in this section of the Opinion applies to all "B" deletions, not only those in Collection 2.

**32.** The Court of Appeals recently reaffirmed this definition in *Sims II, supra*.

**33.** *Sims II*, 709 F.2d at 98, emphasis in original.

**34.** Thus, "where information is not self-evidently sensitive [and] where the reasons why its sources would desire confidentiality are not obvious ... the CIA will be obliged to adduce extrinsic evidence in order to demonstrate its entitlement to the statutory exemption." *Sims II*, 709 F.2d at 101.

**35.** While the *Sims* approach offers considerable guidance in adjudicating an exemption claim

under exemption 3, it is somewhat less useful when the reason given for withholding information is that disclosure of a source's identity would harm the national security. Under *Sims*, a document reporting on a conversation between a CIA agent and a source on a wholly innocuous subject would not be protected even if the source is a highly placed official of a government hostile to the United States. Because of its innocuousness, the information presumably could have been obtained from any number of individuals without a promise of confidentiality; yet disclosure of the particular source is the sort of disclosure exemption 1 properly prevents inasmuch as it would be likely to end the source's usefulness to the CIA and because whatever retribution befell this source might dissuade others who learned of it from continuing to be, or becoming, U.S. intelligence sources. *Lesar v. United States Department of Justice*, 636 F.2d 472, 482 (D.C.Cir.1980). In any event, as a practical matter, the distinction be-

■ In ruling on an exemption 1 claim, the Court must conduct a *de novo* review to determine "whether unauthorized disclosure of the materials reasonably could be expected to cause the requisite harm." *Lesar v. United States Department of Justice, supra*, 636 F.2d at 481. With respect to intelligence sources, the requisite harm would not reasonably be likely, and the exemption claim must fail, if "the scope of the term 'intelligence source' [is] too sweeping." *Id.* at 482. For instance, the item could not include "the ordinary citizen with ordinary contacts abroad." *Id.*

B. At the request of the Court, the CIA has isolated 63 alleged sources it wishes to protect and has arranged the documents according to the source they purportedly identify.

First. Seven of the individuals are described by the CIA as only potential or unwitting sources. Six of these people (identified as D(5),[36] D(6),[37] D(11),[38] D(13),[39] D(19),[40] and D(20))[41] never became sources, that is, they never knowingly provided information to the agency. The seventh (D(18)) is described as "an unwitting CIA source," having given one piece of informa-

tion in 1957 to a CIA representative whom he mistook to be a State Department employee. The documents relating to these individuals are intra-agency memoranda discussing in one way or another, quite briefly, the individuals' potential usefulness as sources.

■ The rationale for protecting sources articulated in *Sims*—to keep valuable information flowing to the CIA that otherwise would not be communicated to it—has no applicability when information was not consciously provided to the CIA in the first place. Moreover, the government has provided no alternative rationale on which denial of the information to plaintiff could be based. Thus, the documents relating to these seven individuals may not be withheld on the basis of 50 U.S.C. § 403(d)(3) and 403g as incorporated in exemption (b)(3). For the same reason, the revelation of the names of individuals who were potential CIA sources would not be reasonably likely to harm the national security, within the meaning of exemption (b)(1), for presumably everyone may be considered a *potential* source.[42] The dele-

tween exemption 1 and exemption 3 does not significantly affect this case because nearly all of the individuals claimed to be sources ceased to be useful to, or used by, the CIA between 20 and 30 years ago. See *infra*. Nevertheless, where a source does not satisfy the *Sims* definition, the Court has considered alternatively whether disclosure of the mere fact that the CIA had the cooperation of the particular individual would harm the national security within the meaning of exemption 1. See *Afshar v. Department of State, supra*, 702 F.2d at 1138 (exemption 3 may be invoked independently of exemption 1).

36. This individual is described as "the possible target of a CIA recruitment attempt" in the Dube affidavit. Dube affidavit at 81.

37. The Dube affidavit observes that the deleted paragraph would reveal that in 1965 this individual "was being considered as a source of intelligence information." Dube affidavit at 82.

38. The CIA information regarding this individual was withheld in its entirety because it would reveal that a CIA officer "was instructed to have social contact with [him] ... [to] use this contact as a means of evaluating [him] as a poten-

tial source of intelligence information. Dube affidavit at 87.

39. The document associated with D(13), withheld in its entirety, is particularly inappropriate for protection under the intelligence source exemption. It mentions a plan by the agency to contact Galindez himself to obtain information about someone else with regard to "the potential operation use" of the other person. Dube affidavit at 89. There is no evidence that Galindez was ever contacted pursuant to the plan, much less that he or the other person ever became "intelligence sources."

40. According to the Dube affidavit,
> The denied portions of this document contain information which shows that the CIA was evaluating [the individual] as a potential source of intelligence information.
Dube affidavit at 95.

41. The information withheld is background information on someone "for the purpose of a possible recruitment approach." Dube affidavit at 96.

42. Actually, it is not clear from the affidavit whether the agency even makes a separate claim that disclosure of the identity of these

tions marked by a letter "D" must therefore be restored and released to plaintiff in documents 108, 383, 165, 9, 458, 483, and 420. Document 436 in group E(11) (see Section VI *infra*) and documents in groups M(20) and M(22) (see section IX *infra*) also relate to potential or unwitting sources and must therefore also be released.

Second. With respect to the remaining redactions which are based on source protection, the agency has followed a generally uninformative course of laying out its case. While the Dube *in camera* affidavit purports in a summary to provide grounds for the withholdings the CIA has made in the name of source protection, the reasons given are so general and conclusory as to be practically worthless.[43] To be sure, the affidavit also provides a justification osten-

sibly tailored to each source,[44] but most of the explanations are again distinctly unhelpful: when they are not merely referring the reader back to the general summary,[45] they provide information that is of little use in evaluating either the practical necessity of secrecy or whether the deleted information would identify a source at all.[46]

The lack of specific justification is particularly troublesome since, as the Court elaborates upon *infra*, "[t]he 25-year period which has elapsed since the events discussed in these documents makes the CIA's burden even heavier." Memorandum, Nov. 19, 1981, at 6 n. 9.

It is to be noted that the need to compensate for the government's lack of concrete explanation required the Court to read and analyze every sentence in every document

---

individuals would harm the national security and that the identities are therefore exempt under (b)(1). In any event, no showing has been made, and it is certainly not self-evident, that national security would be harmed by disclosure of the names of six individuals who passively found their way into CIA files over 25 years ago as possible sources, or by the disclosure of the name of a seventh individual who delivered a relatively innocuous bit of information to a person he thought was a State Department employee but who, in fact, was a CIA representative.

**43.** Characteristic of the summary is its second sentence: "It is axiomatic that an intelligence organization must keep ·the identities of its sources a secret in· order to maintain an effective intelligence capability." Affidavit at 19. The presumption under FOIA is not, however, that any source the CIA wishes to protect is legally protectible; "the burden ... lies with the [CIA] to demonstrate that no segregable, nonexempt portions remain withheld" from plaintiff. *Paisley v. CIA,* 712 F.2d 686 at 700 (D.D.C. 1983).

**44.** Even then, justifications are not provided for each document—and most of the source categories contain more than one document—despite the obligation of the government to present all necessary information in a single, unified affidavit, see *Founding Church of Scientology v. Bell,* 603 F.2d 945, 948–49 (D.C.Cir.1979).

**45.** For example, the third and last sentence of the justification put forth for deletions in doc. 269 (source D(2)) reads:

[Disclosure] would cause the identifiable damage to the national security which is discussed under the Category D heading above.

Yet the only mention of the national security in the section referred to is the following statement:

In those instances in which an individual is a source of sensitive foreign intelligence and the revelation of his identity would cause identifiable damage to the national security, such information ... [is] exempt from disclosure pursuant to FOIA exemption (b)(1).

In short, nothing more has been done than to paraphrase the exemption itself.

Earlier in the general summary, the CIA provides general propositions to the effect·that disclosure of sources could (a) render the disclosed source useless, (b) inspire others to harm the source, (c) dissuade others from continuing to be or becoming sources, or (d) enable "hostile intelligence services to identify that information which the United States has acquired and take countermeasures to reduce or eliminate its usefulness." These generalizations are surely correct in the abstract. The question before the Court, however, is whether adverse consequences cognizable under FOIA would flow from a particular disclosure of a particular document or portion of a document.

**46.** The agency states that it has included within the source category not only names and "other direct personal identifier[s]," but also "information which by its specificity or context could reasonably be expected to identify an intelligence source." Affidavit at 19. The Court has found that many of the withholdings justified on this latter basis are overinclusive. Cf. *Diamond v. FBI,* 532 F.Supp. 216, 222 n. 4 (S.D.N.Y. 1981) ("singular identifier for an intelligence source" found to be "nothing more than the size and price of a Harvard University Press book that was being scrutinized by the FBI").

and to compare deletions with the full text versions. This was, of course, a time-consuming chore which the Court had hoped would be avoided by more complete CIA cooperation with the Court's last Memorandum.[47]

■■■ Third. Almost without exception what are sought to be produced are past sources, most of whom gave information over 25 years ago and have had no dealings with the CIA since. Much substantive information—far more than mere names of sources and cryptonyms[48]—has also been withheld under this category on the rationale that it might identify a source.[49]

Most of the documents refer to contacts that took place in the Dominican Republic between United States representatives stationed in that country and civilians and government officials who lived and worked there.[50] The affidavits indicate no knowledge of these individuals' current whereabouts or even whether they are alive or dead.[51] Thus, an issue common to many of the withholdings is the effect of the passage of time on the *Sims* definition of "intelligence source" and on the propriety of the information's continued classification.[52]

Obviously, if someone would not have qualified as an "intelligence source" 20 or 25 years ago, he would not so qualify now.[53] Yet it does not follow that, if someone would have so qualified then—that is, if the information imparted was the type that would not have been conveyed but for a pledge of confidentiality—the information is still protected now. The government's contrary position on this issue—that the passage of time makes no difference[54] —has, indeed, been rejected by those courts which have presided over FOIA

---

**47.** Interestingly, with respect to some deletions in the "source" category the CIA has provided the Court with information distinctly more specific than that found in most of its source annotations, indicating that it has the capacity to provide the detail the Court has repeatedly requested.

**48.** Cryptonyms are code words used by the CIA in place of some personal names and also to identify certain operations. See section VII *infra.*

**49.** Even information that was not provided by the source in question, but which relates to the same subject matter as information provided by the source, has been withheld on this basis.

**50.** Some American citizens who either lived in the Dominican Republic or were frequent travelers there also supplied bits of information. What value and sensitivity all of these contacts had, they derived it from the political context in which they occurred and the climate of fear inspired by the Trujillo regime. Given Trujillo's reputation, people were concerned lest it fall into the wrong hands that they were working against his interests, even· when their activity consisted only of passing along bits of local gossip such as who was seen where and what Trujillo was rumored to have said at a party. The regime which made these contacts sensitive was ousted in 1961, and the current government, a stable one, has disavowed all ties with Trujillo's politics, attitudes, and methods.

**51.** The CIA simply asserts that it may be presumed that these individuals, if dead, have surviving relatives who could be the targets of harm.

**52.** As the Court of Appeals has noted, it is not surprising that "inquiries into the applicability of [exemptions 1 and 3] may tend to merge." *Phillippi v. CIA, supra,* 546 F.2d 1009 at 1015–16 n. 14 (D.C.Cir.1976).

**53.** It is difficult to determine whether 20 or 25 years ago, in a different country and at a different time, the CIA could have obtained a discrete piece of information without having promised confidentiality to the informant, and one piece of probative evidence—whether the individual asked for or was promised confidentiality—is not available in many cases. It would obviously also be extremely time-consuming, if not impossible, for the Court to engage in such an exercise with respect to over sixty different individuals. For these reasons, among others, a rule of general applicability is necessary in such a case.

**54.** In not a single instance does the CIA concede that protection of a particular source is no longer warranted. In response to plaintiff's various challenges of the need for continued protection with respect to a particular individual or document, the CIA typically states,

> This is an example of Plaintiff's continuous assertion that any CIA source of 25 years ago would face no physical danger today.... The CIA continues to believe that this source must be protected for the reasons outlined [in the general summary] above.

Affidavit at 76.

cases involving requests for documents as antiquated as these. See, *e.g., Diamond v. FBI*, 532 F.Supp. 216 (S.D.N.Y.1981), *aff'd*, 707 F.2d 75 (2d Cir.1983); *Times Newspapers of Great Britain v. CIA*, 539 F.Supp. 678, 683 (S.D.N.Y.1982); *Dunaway v. Webster*, 519 F.Supp. 1059 (N.D.Cal.1981). To the extent that courts have protected the identities of third parties, they did so under the primary exemption for investigatory records ((b)(7)),[55] and only after examining the nature of the information withheld, the likelihood that disclosure would embarrass third parties still alive,[56] and the public interest in disclosure.[57] It may finally be noted with regard to this issue that Executive Order 12,065, which contains a presumption that revelation of a *current* or recent source causes damage to the national security, includes a contrary presumption with respect to records of the vintage involved in this case: that documents are to be declassified after 20 years.[58]

For the reasons stated, the Court rejects the general presumption argued for by the CIA—that revelation of *any* individual with whom it spoke to regarding the Galindez matter, no matter how long ago, would be likely to cause identifiable damage to the national defense or U.S. foreign policy.

The question to be asked, therefore, and which the Court has considered, is whether any particular "source" would be likely to face retribution or embarrassment today such that he would have withheld the information had he known or suspected that the confidentiality promised him—if in fact it was promised—might expire after 25 years.[59] Only where the answer is in the affirmative could disclosure be presumed to deter existing and potential sources from cooperating with the agency—the main "national security" reason being advanced.[60]

There certainly are some sources who would still suffer embarrassment were

---

**55.** This exemption protects investigatory records the production of which, *inter alia*, would "constitute an unwarranted invasion of personal privacy" or "disclose the identity of a confidential source." The CIA initially invoked exemption (b)(7) in this case but has since abandoned its reliance on that provision. The FBI, however, still relies on exemption (b)(7) for its treatment of 11 documents. See section VIII *infra*.

**56.** Operating under exemption (b)(7), the courts have found that a person's privacy interest diminished, if it did not cease, upon death, and the *Dunaway* court took judicial notice of an individual's death in deciding whether to uphold the FBI's exemption claim. *519 F.Supp. at 1078* n. 17.

**57.** Both the *Dunaway* and *Diamond* cases involved requests for documents generated during the 1950's in the context of investigations into allegedly subversive conduct by American citizens. Both courts determined that the information in the documents about third parties who had been investigatory targets was unsubstantiated, highly personal, and still embarrassing 30 years later, and that confirmation that other individuals had aided the FBI would be embarrassing for these individuals. Moreover, the public interest in the identities of these individuals was not great, the courts found, because these identities themselves did not add anything significantly instructive to an understanding of the FBI's conduct during the McCarthy era.

**58.** See Executive Order 12065, § 1–402:

> Only officials with Top Secret classification authority and agency heads ... may classify information for more than six years from the date of the original classification. This authority shall be used sparingly. In such cases, a declassification date or event, or a date for review shall be set. This date or event shall be as early as national security permits and shall be no more than twenty years after original classification, except that for foreign government information the date or event may be up to thirty years after original classification.

50 U.S.C. § 401 (1981 supp.)

**59.** Plaintiff, handicapped due to the *in camera* nature of many of the filings, has nevertheless attempted to "demonstrate the excessiveness of the CIA deletions" through affidavits based on his own research, attempting to show that "[t]he passage of time and the political changes occurring since the Galindez case have greatly diluted the connection between Galindez-related events and current CIA activities." Plaintiff's Memorandum filed March 11, 1982, at 3–4.

**60.** Except in a few instances involving individuals with alleged ties to organized crime figures, any claim that the sources would face physical peril today cannot be taken seriously due to the passage of time, the long dormancy of the controversy, and the deaths of Trujillo and Arturo Espaillat, his former police chief.

their cooperation with the CIA 25 years ago to be revealed, and it would presumably follow that sources in like situations today might genuinely be deterred from cooperating if they thought they could count on confidentiality of only limited duration. For that reason, the Court gave the agency ample opportunity to point out such cases through three separate rounds of briefing in this case. More, in its own painstaking review of the documents, the Court has evaluated each source, and it has upheld nondisclosure where there appeared· to be any question that the individual, if he or she is still alive, might be embarrassed or harmed by revelation.[61] In this effort, the Court has in the main followed the rationale of Executive Order 12,065, in that it has presumed that an individual who imparted information to the CIA over 20 years ago is not a source whose revelation would damage national security today. That presumption has not been regarded conclusive, but its effect has been to place the burden of providing contrary reasons on the CIA. This is neither unfair nor illogical, for the CIA is in possession of the documents, has superior information, and has knowledge of what is contained in the *in camera* filings.[62]

C. On the basis of these tests, the Court upholds the withholding of source names and other identifying information in a number of instances,[63] particularly where the individual held a position in a foreign government other than the Dominican Republic, and may still be in public service in that country[64] such that he might suffer

embarrassment and this embarrassment might deter others in like circumstances from cooperating with the CIA. In a number of other cases, however, the Court is ordering revelation of the sources' identities and therefore of information which the CIA has withheld on the ground that it might identify the sources.[65]

D. The Court finally notes that the public interest in airing the details of the Galindez matter is still considerable, and that this is not a case where the CIA was performing espionage or planning operations contrary to the interests of other countries, the revelation of which could be expected to invite hostile reaction from the governments of peoples of these countries. On the contrary, the CIA's conduct, at least in gathering information in the Dominican Republic, was in the nature of an investigation into the disappearance of one American citizen and the death of another. But for the alleged involvement of Trujillo's forces and Galindez's ties to the Basque government, the CIA might not have been involved at all. Furthermore, the government with the most reason to react angrily to the disclosures—the Trujillo government—is now a relic of some 22 years.

The specific rulings of the Court in regard to sources are contained in the Appendix to this Opinion.

## VI

*Investigations, Methods, Cover*

Collection 7 contains documents which the CIA claims to have edited in order to

**61.** Many of the sources in this case, far from being embarrassed by revelation, might well be thought to be popular, particularly in the Dominican Republic, for having helped, no matter how slightly, to work against a dictator now unpopular and scorned.

**62.** If the burden were placed on the plaintiff, he would have no means of ever overcoming a government claim of this kind. This is not what the FOIA contemplates.

**63.** In all cases the CIA may continue to withhold the one-word cryptonyms that are used in place of source names. There is little value to plaintiff in these code words, and the CIA has a strong interest in keeping such internal organizational data secret. See section VII *infra.*

**64.** The CIA has in no instance confirmed that a diplomat who was active at the time these documents were generated is still in public service or even that he is still alive. Instead, the agency has simply stated that it does not have the resources to undertake such an investigation.

**65.** In the instances where revelation of information is being required, the sources are dead; the Court has been able to conclude that the individual would not have been a *Sims* source at the time; or the information is so innocuous or outdated that its disclosure poses no danger of harm or embarrassment to the individual, if he or she is still alive.

prevent revelation of specific CIA operations in foreign countries and methods the agency used then and in some cases continues to use now. Collection 8 includes documents that have been "sanitized" to protect the various covers of CIA agents. For both collections the CIA invokes both exemption (b)(1), since most of the material in these documents was classified pursuant to Executive Order 12,065, and exemption (b)(3), incorporating the statutory responsibility of the CIA Director to protect "intelligence methods." 50 U.S.C. §§ 403(d)(3), 403g.[66]

The agency has followed the same course in justifying the deletions in Collection 7 as it followed with regard to intelligence sources. There is a general summary containing abstract reasons for protecting information about operations, methods, and cover. There are also specific explanations for individual groupings of documents which relate to a common theme, e.g., a particular operation in a foreign country, a particular CIA intelligence capability, or a particular individual who assisted the agency in a more comprehensive fashion than the intelligence sources discussed *supra*.

As a rule, these explanations are more detailed and persuasive than those which accompanied the intelligence source documents. Some of the information, in addition, pertains to intelligence operations of a more recent vintage than the late 1950's and early 1960's. Accordingly, the Court

upholds these deletions,[67] including several of a highly sensitive character.

■ However, the Court's *in camera* review indicates that in some cases in this category the CIA has withheld information so basic and innocent that its release could not harm the national security or betray a CIA method.[68] The FOIA exemptions, which are meant to be construed narrowly (*Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir.1973)) do not protect against disclosure that CIA agents sometimes talk to individuals they believe may have useful information. Moreover, in some instances, a weak claim is asserted with respect to particularly noteworthy information—such as the suggestion that Galindez may not have perished at all but may have fled to another country. There, the data is clearly not reasonably likely to cause harm to the national defense today, and it may be that the CIA is acting more out of a desire to prevent a politically unpalatable reaction than out of a legitimate judgment that secrecy is required. Similarly, the CIA has withheld sentences in a memorandum relating to the watching of a house in Europe to determine the comings and goings of its occupants. (400; § E(9)). There is no allegation that 27 years later this house is still under surveillance, and it cannot seriously be argued that confirmation of the fact that the CIA sometimes watches houses would be likely to cause identifiable damage to the national security. Accord *Dun-*

---

66. Some material has been withheld on privacy grounds, and these (b)(6) withholdings are discussed in section II *supra*. In addition, the "A" and "B" deletions are subject to the Court's rulings elsewhere in this Opinion (see sections IV *supra* and VII *infra*).

67. Courts have been careful to guard against disclosure of CIA methods because of the harm to the agency that would result from "neutralizing" the usefulness of such methods and cover in the future. The CIA avers that many of the methods reflected in these documents are still employed today, and the Court must give substantial deference to the CIA in this regard. As for operations, the level of detail involved makes this category different from mere confirmation of a former CIA presence in a foreign country. Documents which reveal what the CIA was able to do in particular countries, and did

in fact do, are akin to records which reflect active cooperation between the CIA and foreign intelligence services (see section III *supra*) and are more likely to prompt a current reaction from the foreign governments involved than are documents that reveal merely the identity of an individual past source. See, *e.g., Halkin v. Helms*, 690 F.2d at 994.

68. For instance, the CIA justifies the withholding of an entire document (# 119, § E(6)) on the basis that it would reveal "CIA's operational capabilities in ... two countries." Affidavit at 162. Upon inspection, one learns that the "operational capability" is the fact that the CIA was considering interviewing an unnamed taxidriver in a Latin American country about a claim he had made to a diplomat in late 1956 that a man resembling Galindez had been his passenger.

*away v. Webster, supra,* 519 F.Supp. at 1070 (N.D.Cal.1981) (no protection for "methods of investigation which would ... leap to the mind of the simplest-minded intelligence agency"). The same is true of these "methods": having contacts with foreign journalists (124, § E(6)), and viewing airplane passenger lists (F192, F194 § E(10)). Accordingly, the Court finds that the CIA has not carried its burden with respect to these and certain other deletions made in this category. A list of the Court's rulings in this regard is found in the Appendix.

The Court upholds all of the deletions made in the documents in Collection 8.[69] These deletions are minor and appear to the Court to be specifically tailored to protect solely the cover of CIA officials and informants. To disclose this material would not only lead to identification of former CIA officials but it might also cast suspicion on anyone holding similar cover positions today.

### VII

### *Employee Names, Internal Organization Data*

 The Court previously held that "security markings, file numbers and names of employees" could properly be withheld under exemption (b)(3) as "fit[ting] squarely within the protection of 50 U.S.C. § 403g as information concerning the CIA's 'internal structure.' " Memorandum of November 16, 1981, at 7. The CIA has aggregated in Collection 14 documents whose deletions fall solely into this category, identified by the letter code "A."[70] The Court has reviewed the volume to ensure that the CIA has not been overinclusive in its deletions. It is apparent that with respect to

the deletions marked with "A" the CIA has acted within the letter and spirit of FOIA; the deletions are minor, obscuring only individual words, letters and symbols that would reveal employee names and details of internal structure that are of little value to a layperson, but which might be useful to someone desirous of penetrating CIA methodology. Accordingly, all "A" deletions in Collection 14 are upheld.[71]

 A distinct type of internal organization information, cryptonyms, may also be withheld from plaintiff pursuant to both exemption (b)(1) and exemption (b)(3). Such code words are of little value to plaintiff, yet they may afford hostile analysis to too great an insight into the CIA's past actions and current methodology. See, *e.g., Military Audit Project v. Casey, supra,* 656 F.2d at 748. Cryptonyms have been replaced with the letter "C" in these documents. All of these deletions are upheld.

### VIII

### *Investigatory Records*

The FBI has invoked exemption (b)(7)(C) and (b)(7)(D) to withhold FBI-generated material found in ten CIA documents. See note 5 *supra.* These exemptions allow an agency to withhold:

investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence in-

---

**69.** These documents are: 348, F4, F120, F148, F149, F163, F167, F207, F209, F210, F211, F217, F224, F228, F368, F371.

**70.** "A" and "B" deletions appear in nearly every document, no matter in what category the CIA has placed the documents. The Court's holding with respect to "A" deletions pertains to all such deletions, whether they are contained in documents in Collection 14 or elsewhere.

**71.** The documents are: 18, 195, 204, 220, 239, 252, 253, 255, 261, 313, 320, 370, 371, 375, 376, 381, 382, 403, 433, 491, 512, F29, F117, F123, F129, F152, F204, F206, F218, F229, F230, F236, F310, F317, F345, F347, F351, S–1, S–2, S–4, S–5, S–6, S–7, S–8, S–9, S–11, S–23, S–26, S–29, S–31, S–32, S–33, S–34, S–35, S–37, S–38, S–39, S–41, S–43.

vestigation, confidential information furnished only by the confidential source
. . . .

 Deletions in three documents are defended on the basis that they would unjustifiedly invade the privacy of third persons mentioned in the documents. The Court upholds the FBI's deletion of the name of the individual referred to in document 6 (Collection 1) as "iden B." The FBI cleared for release the information provided by this individual, recorded in document 7 (Collection 1), but it correctly points out that since the individual is cast as a possible liar and traitor to the Basque cause disclosure of his identity might cause him embarrassment and ridicule out of proportion to the value to plaintiff of obtaining his name.[72]

 The FBI has not, however, carried its burden with respect to the individual named on page 2 of document 311 (Collection 12). The individual is not described, either favorably or unfavorably; it is merely reported in one sentence that his name appeared in an FBI report. The bare fact that an individual's name appears in an FBI report in a case as wide-ranging as the Galindez investigation is not sufficiently injurious of his privacy to overcome FOIA's presumption in favor of disclosure. The name must be released.

 The final (b)(7)(C) deletion is likewise unfounded. In document F189 (Collection 10), devoted to Stanley Ross, then New York publisher of *El Diario*, the FBI has withheld four paragraphs on the rationale that they concern specific events that occurred some 13 years prior to Ross's prominence in the Galindez investigation. The problem with this stance is that the FBI cleared for release in the same document a paragraph containing a far more opprobrious item than any of the information contained in the deleted paragraphs.[73] Given the prominence of Ross in the investigation and the extent of the disclosures already made regarding him by both the FBI and CIA, the FBI's rationale is not credible and the material must be released.[74]

 The FBI invokes exemption (b)(7)(D) to protect the names of three individuals who were interviewed by the agency, one for a purpose that is not clear from the relevant document (311), another to ascertain information about an individual being investigated (497, p. 2) and the third for the purpose of eliciting details about Murphy's activities before he disappeared (232, 233, 238, 251, 254, 267) (Collection M). The information provided by the first two individuals was released, as was most of the information provided by the third (information which would reveal the latter's identity was withheld). Although the Court might disagree with the agency's decisions, the *in camera* affidavit is so detailed with respect to the deletions, noting the request for confidentiality by the third individual and the implied confidentiality accorded the other individuals, and the FBI has so clearly segregated all material with the agency regarded as nonconfidential, that the Court uphold the deletions based largely on the agency's evident good faith.[75]

The final deletion, on page three of documents 497, is also upheld since it is apparent that release of the deleted information could chill cooperation with the FBI by a defined segment of American society.

### IX

#### Miscellaneous

The CIA has submitted two collections marked "miscellaneous." (Collections 9

---

72. The individual was only remotely related to the investigation into Galindez's disappearance.

73. The CIA claimed a (b)(6) privacy exemption for this paragraph, which the Court denies in Section II *supra.*

74. It should be noted that none of the material about Ross indicates that he was cooperating with the FBI such that information about him should be protected "in order to assure the future cooperation of such third persons willing to honestly relate pertinent facts bearing upon a particular investigation." *Varona Pacheco v. FBI,* 456 F.Supp. at 1030.

75. The deletions in documents 238, 251, 254, and 267 are upheld independently on grounds advanced by the CIA. See section IX *infra.*

and 10). These collections include 24 groups of documents the deletions in which are justified primarily on national security grounds, but which the CIA, for reasons that are not altogether clear, chose not to include in the other compilations. The Dube affidavit does not attempt to explain why these documents could not be categorized; its one-paragraph general reference to the miscellaneous collections states simply that "[t]he rationale for the withholding of information from each of these documents is set forth in the comment for each of the groups...." Dube Affidavit at 28. The documents are not different in kind from the records included in the other collections, and the reasons given for non-disclosure are identical to those given elsewhere: the need to avoid confirming past liaisons with foreign intelligence services, to avoid exposure of confidential sources, former CIA employees, and former CIA stations, and to protect the privacy of individuals mentioned in the records. These documents may have been separately bound because no one reason for non-disclosure was dominant.

Whatever the rationale, the Court has reviewed the "miscellaneous" documents in conjunction with the 24 group comments in the same manner that it has dealt with the other collections and in so doing has concluded that the CIA, leaving aside the deletions defended on privacy grounds, which are dealt with in Section II *supra*, has carried its burden with respect to the treatment accorded to a number of the documents, and all of them may be withheld.[76] However, it has failed to carry its burden with respect to deletions justified on the basis that the deleted matter would confirm that the CIA conducted intelligence operations in the Dominican Republic in the late 1950's since this fact has been disclosed by Congress and is publicly known within the meaning of *Afshar v. Department of State, supra.* See Section IV *supra.* Accordingly, information withheld on this rationale in several documents must be restored.[77] In addition, in several documents the CIA improperly withheld biographical and descriptive information about individuals who figured in the Galindez investigation on the basis that the information was obtained from foreign intelligence services even when the deleted matter would not reveal this fact.[78]

The CIA also incorrectly used the confidential source exemption to shield the name of a potential source and other information in document F233 (M(20)); to protect the name of an individual who willingly gave information regarding Gerald Murphy to a U.S. official as *reflected in a series* of documents in group M(22) (F27, F79, F80, F83, F84, F372, F373, S–12, S–36), and to delete information in document F116 (M(11)) about a rumor which the document indicates was known to several Dominican "army officers." See generally Section V *supra.* The CIA finally improperly withheld matter in paragraphs 7(d–1) through 7(d–4) in document 48 (M(3)) since these paragraphs merely describe and quote from a published article in a Latin American periodical; improperly withheld portions of document 467 (M(14)) that at best allude to a "method[ ] of investigation which would ... leap to the mind of the simplest-minded intelligence agency" (*Dunaway v. Webster, supra,* 519 F.Supp. at 1070); and improperly invoked exemption (b)(5), intended to protect intra-agency de-

---

**76.** F101(M(1)); F186(M(2)); F189, S–40(M(6)); F212(M(7)); F13(M(8)); F116(M(9)); 82(M(13)); 153, 155, 238, 251, 254, 265, 267(M(15)); 114(M(17)); F187(M(18)); 137, 173, F38(M(19)); 515, F216, S–42, S–46(M(20)); 384, 442, 449, 450, 459, 460, 472, 475, 477, 496, 501, 502, 504, 505, F105, F110, F113, F114(M(21)); 331, 387, F340(M(23)); 185(M(24)); S–27, S–28, S–30(M(25)).

**77.** 132, 164(M(4)); 115(M(12)); 263(M(16)); F227(M(21)).

**78.** 48(M(3)); F33(M(5)); 42(M(10)). The situation is different with respect to document 326(M(25)). The FBI's *in camera* affidavit of Peter Kelley asserts in considerable detail how the information deleted from ¶ 2, sentence 2 to the end of ¶ 3 pursuant to exemption (b)(1) "could provide the missing clue or one of the clues needed by a hostile analyst to identify the source." Kelley affidavit at 10. The deletions in document 326 are accordingly upheld.

liberations and advisory communications, to withhold several paragraphs of document S–13 (M(26)).

## X

### Adequacy of CIA's Search

Plaintiff's complaint includes a claim that the CIA [79] has not performed an adequate search for documents—specifically that it employed an overly narrow definition of the Galindez case in searching its files.[80] The CIA has moved for summary judgment on this issue [81] contending that it conducted a "reasonable" search even if some documents responsive to plaintiff's request were not uncovered thereby. Plaintiff opposes summary judgment, maintaining that a material question of fact exists as to the adequacy of the definition employed by the CIA, a claim he supports by mentioning specific events and people which, according to his independent research, logically should appear in documents released to him but which have not so appeared.[82]

Both sides are rhetorically rather vehement. Plaintiff asks the Court to order the CIA to reinspect the 23 files it has already searched, using a broader definition that would encompass documents containing references to these absent events and people. The CIA complains of "[p]laintiff's evolutionary, mushrooming request over the last six years," and describes plaintiff's position as resting on "bare suspicions that certain

documents have been overlooked." Motion for summary judgment at 3.

■ The burden is on the CIA to "show beyond material doubt ... that it has conducted a search reasonably calculated to uncover all relevant documents" by "document[ing] ... that it [has] taken all reasonable steps to find materials responsive to [plaintiff's] request." *Weisburg v. U.S. Dept. of Justice*, 705 F.2d 1344, 1351 (D.C. Cir.1983). One way for plaintiff to cast doubt on the agency's claim of adequacy is to produce "evidence that relevant records have not been released," *id.*, which plaintiff has attempted to do, as noted above. Although the CIA declined to meet this factual assertion head on, the Court, having carefully reviewed each and every document, is able to state with considerable confidence that the documents themselves refute plaintiff's assertion.

■ The documents identified as a result of the CIA's search do contain references to the particular events and people specifically mentioned by plaintiff. These references failed to reach plaintiff not because they are contained in documents that were never removed from the files, but on account of the deletions made by the CIA once records were identified.

Since there is no other factual dispute over the adequacy of the search properly before the Court,[83] the Court will grant the

---

**79.** Plaintiff does not challenge the adequacy of the FBI's search for documents.

**80.** Plaintiff does not dispute that the CIA searched the logical files: the file on the Galindez case, the personal files on Galindez and Murphy, and the files on 20 other persons plaintiff initially identified as having figured in the Galindez affair. See Plaintiff's Memorandum in Response to Court Order Dated November 16, 1981, at 4 n. *.

**81.** Plaintiff has not moved for summary judgment on this question but agrees that "[t]he issue [is] ripe for entry of judgment by the Court," *id.* at 1, because of a prior order by the court preventing further discovery in the case.

**82.** Some of the events are the search of Galindez's apartment and Galindez's affiliation with the Basque government-in-exile.

**83.** In ruling on the adequacy of the CIA's search, the Court is not considering the CIA's response to plaintiff's supplemental FOIA request which provided the CIA with a list of 84 additional persons whose files might contain documents related to the Galindez case. Plaintiff first furnished the CIA with this list in April 1978, nearly 3½ years after he made his initial requests of the FBI and CIA. At the urging of the Court, the CIA and FBI agreed to process these later requests ahead of other FOIA requests filed after plaintiff's first request but before his supplemental request, although the government disputed that the supplemental request was properly part of the instant lawsuit. Upon the government's representation that it would begin processing, the Court agreed to dismiss the complaint insofar as it might be read to include the supplemental request. Order dated July 19, 1979. The dismissal was conditioned, however, on the provision of an

CIA's motion for summary judgment on this claim.

## X

### Conclusion

By a separate Order the Court grants plaintiff's motion for summary judgment with respect to material that the CIA and FBI have improperly withheld (as set forth in this Opinion and in the Appendix) and it grants defendants' motion for summary judgment with respect to material which properly falls within exemptions to the Freedom of Information Act as well as on the claim regarding the adequacy of the CIA's search for documents.

### APPENDIX

#### Section II

| Doc. # | | Page(s) (¶, line) |
|--------|------|-------------------|
| A–1 | 479: | properly withheld; information of the sort found in personnel files |
| A–1 | 123: | properly withheld; sexual information |
| D(14) | 435: | improperly withheld; public interest outweighs private interest |
| D(29) | 98: | improperly withheld; public interest outweighs private interest |
| D(58) | 131: | properly withheld; medical information |

| Doc. # | | Page(s) (¶, line) |
|--------|------|-------------------|
| D(62) | 97: | statement pertaining to individual's mother properly withheld; remaining "F" material improperly withheld because public interest outweighs private interest |
| E(5) | 497: | 2, ¶1 improperly withheld; public interest outweighs private interest |
| | | 2, ¶5 improperly withheld; public interest outweighs private interest |
| E(8) | 415: | ¶1 properly withheld; sexual information |
| | | ¶4, lines 1–5 improperly withheld; public interest outweighs private interest |
| | | ¶4, lines 5–7; properly withheld; sexual information |
| | 426: | 2, ¶5 improperly withheld; public interest outweights private interest |
| E(11) | 436: | 3, ¶1 improperly withheld; public interest outweighs private interest |
| E(15) | F197: | 1, ¶2 improperly withheld; public interest outweighs private interest |
| E(17) | 373: | 1, ¶A improperly withheld; public interest outweighs private interest |
| | | 2, ¶2 last three words of second sentence properly withheld as medical information |
| | | 2, ¶3 improperly withheld; public interest outweighs private interest |
| | 374: | 3, ¶12B properly withheld; personnel information |
| | | 3, ¶12D properly withheld; private information outweighs public interest |

explanation by the defendants within 20 days on the basis for their claim that the data already furnished by plaintiff was insufficient for further processing. Rather than offer an explanation, the government reported that it would process the requests with the information already provided after all. Thereafter the Court never formally entered an order of partial dismissal, but both parties treated the supplemental request as though it had been dismissed. See plaintiff's motion for reconsideration, denied in an order dated February 1, 1980.

According to plaintiff, as of March 11, 1982, he had received only 36 documents which the CIA claimed were responsive to 73 of the 84 later requests, and he had not received any documents in response to the remaining 11 although the CIA in a memorandum dated December 28, 1981 committed itself to completing processing of the last 11 by January 6, 1982. In addition, as of April 9, 1982, of the 154 referrals from the FBI to the CIA pertaining to the 84 individuals, the CIA had not addressed 16, claimed 75 were outside the scope of plaintiff's request, and had made deletions in most of the others. The government in this case apparently has chosen to operate differently from the government agency involved in *Weisberg v. Department of Justice, supra,* 705 F.2d at 1354 n. 12, about whom the Court of Appeals stated:

> [I]t does little good for the government to note that a document falls outside of the original request if [plaintiff] can simply initiate another request and thereby force it to search for the new document. It appears that the government generally thought it best simply to search for anything [plaintiff] requested along the way in order to end the matter once and for all.

In its opinion of November 19, 1981 the Court expressed its displeasure at the snail's pace with which the processing of the supplemental 84 requests was proceeding, and it may be expected that the process has been completed since the Court was last informed by the parties of the case's status. In any event, it appears that, on the basis of the chronology recited above, the matter is closed insofar as this lawsuit is concerned.

| Doc. # | | Page(s) (¶, line) |
|---|---|---|
| M(5) | F33: | 1, improperly withheld; not "intimate" and public interest outweighs private interest |
| M(6) | F189: | 2, 4, 9, improperly withheld; not "intimate" and public interest outweighs private interest |
| M(7) | F212: | 1, 2, though medical information in part, improperly withheld since CIA released same information in preceding paragraph and public interest outweighs private interest |
| M(8) | F13: | 1, improperly withheld; not "intimate" and public interest outweighs private interest |
| M(19) | 173: | 1, 3, 4, "intimate"; private interest outweighs public interest |

### Section III

A. Judgment is granted for the government with respect to the following redactions: [84]

*Collection 1:*

| | |
|---|---|
| 2 | all |
| 8 | 1 (¶2, 2nd sent.) |
| 12 | 1 (¶s 1, 5), 2 (¶6, 2d sent.) |
| 69 | all |
| 70 | all |
| 113 | 1 (¶2, lines 3–8; ¶3, lines 1–2; ¶4 lines 2–3), 2 (lines 1–8) |
| 114 | all |
| 177 | all |
| 182 | 1 (¶1, lines 3–6) |
| 260 | all |
| 262 | all |
| 266 | 1 (¶2, lines 2–3) |
| 295 | all |
| 298 | all |
| 299 | all |
| 300 | all |
| 301 | all |
| 302 | all |
| 303 | all |
| 304 | all |
| 305 | all |
| 307 | 1, 2 (¶1 all; ¶2 lines 1, 3, 5, 6; ¶2, lines 1–5) |
| 308 | all |
| 309 | all |
| 314 | 1 (¶3 all; ¶3b all; ¶3c all), (¶4, lines 3–10) |

| | |
|---|---|
| 315 | 1 (¶2, lines 1–15, 16–20; ¶3 all), 2 (¶3 con't all; lines 3–8; ¶4, lines 1–2, 5–22, 24–25, 25–29, ¶5), 3 (¶6 all; ¶7, lines 3–11; ¶8, lines 1–2) |
| 336 | all |
| 337 | all |
| 338 | all but ¶1, lines 1–4 |
| 377 | 2 (¶f, lines 1–2; ¶3, lines 1–8, 10–12), 3 (last 17 words) |
| 380 | 1 (¶1, line 7) |
| F200 | 1 (¶1, ¶2 all; ¶3 all except lines 2–3) |
| F297 | 1 (¶1, lines 8–14; ¶2, lines 2–5, 6–7) |
| F312 | 2 (¶1, lines 1–14) |
| F313 | 1 (¶2, lines 9–13) |
| F320 | 2 (second half of page except for top six lines) |
| F349 | 1 (¶3, lines 1–6) |
| F350 | 2 (¶1, lines 1–13) |
| F353 | 1 (¶2, lines 9–13, 14) |
| F376 | 1 (¶2, all but lines 1–3) |
| S–10 | all |
| S–24 | all |

*Collections 12 and 13:*

24, 32, 33, 35, 36, 41, 44, 46, 47, 50, 55, 72, 102, 122, 184, 186, 206, 225, 237, 243, 248, 256, 272, 273, 311, 339, 351, 356, 368, 369, 379, 390, 391, 392, 393, 394, 395, 396, 397, 398, 401, 402, 405, 406, 407, 414, 422, 423, 432, 438, 443, 446, 447, 451, 452, 454, 456, 464, 466, 488, 490, 499, 500, 503, F10, F11, F19, F21, F28, F30, F42, F49, F111, F121, F168, F226, F248, F249, F250, F251, F252, F253, F254, F261, F262, F271, F276, F318, F319, F328, F358

B. With regard to the following documents summary judgment is granted in part to plaintiff and in part to defendant CIA. In these documents, the CIA has met its burden with respect to some deletions, which might expose a link between the United States and a foreign intelligence service, but a number of the deletions are overinclusive, meaning that non-sensitive, segregable portions still exist. The Court

---

84. These are instances in which the treatment given the documents by the CIA is being upheld in all respects.

orders the CIA to release the segregable portions as follows: [85]

| | |
|---|---|
| 3 | cover letter; questions on pages 1–6 and any answers that will not reveal identity of individual responding |
| 4 | 1 (¶1, first 7 words; ¶2, all except the three names; ¶3, all except the three (different) names) |
| 5 | 1 (¶1, first three sentences (report about FBI activity, which FBI has cleared for release); ¶2, all except last sentence and parenthetical) |
| 6 | 1 (of list of eight identities referred to by euphemism in doc. #5, release Iden. A, E, F, G, H) |
| 7 | 1 (¶1, replace "D" deletions except for last sentence) |
| 10 | 1 (¶4, first 15 words except for 13th word (name); ¶5, first sentence except for first word, which is a cryptonym for source, second sentence except for words 11–17; ¶6 words 8–18) |
| 11 | 1 (¶3, first 5 words) |
| 13 | 2 (¶4B, release all except for names and source cryptonyms) |
| 15 | 1 (¶5, release second of three sentences withheld by CIA) |
| 16 | 1 (¶2, all except cryptonym) (name released by CIA in #17) |
| 17 | 1 (¶2, all except cryptonym) |
| 19 | 1 (¶3, all except first word (cryptonym) (CIA released the name of the individual mentioned in doc. #12) |
| 20 | 1 (¶2, first two sentences) (referring to an article and to a meeting of a political group -- no sensitive information included) |
| 51 | 1 (¶1, first two sentences, first nine words of third sentence; ¶2, all except words 4–13 in second sentence) |
| 52 | 1 (¶1, full sentence on 5th line, sentence beginning with "Since" on 6th line, parenthetical beginning on 9th line; ¶3, all) |
| 53 | 1 (¶2, release all except first three words, 3rd sentence beginning with "Should," and personal name) |
| 56 | 1 (¶2, second sentence; ¶3, line 1, 3rd sent. beginning with "to present") |
| 57 | 1 (¶5, all) (CIA released fact that it contacted NYPD on its own in doc. #294) |
| 65 | routing sheet, without names; 1 (¶1, all; ¶A, all) |
| 66 | 2 (¶3, all; ¶4, all) |

| | |
|---|---|
| 67 | 1 all |
| 68 | 1 (¶3, 3rd sentence) |
| 78 | 1, all except last two lines |
| 79 | 1, all except ¶3 |
| 86 | 1, all except ¶3 |
| 90 | 1, all except ¶3 |
| 100 | 1 (¶2A, all except first 7 words of 5th sentence and name of subject) |
| 109 | 1 (¶2, last sentence beginning with "it had been") |
| 120 | 1 (¶2, except for name; ¶3, except for name; ¶4, except for name) |
| 123 | 1 (¶2, lines 1–4 (CIA already released name in #12); ¶4, all except subject's name) |
| 270 | 2 (¶6, all except first 6 words of line 4, cryptonyms, and name in 7th line); 3 (¶6, cont., all except last sentence) |
| 290 | 1 (¶2, first sentence ending with "April.") |
| 291 | 1 (¶3, lines 1–6, 14–16); 2 (¶II, all; ¶3, all; ¶4, all; ¶5, all; ¶6, all; ¶10, all) |
| 294 | 2 (¶4, lines 3–7 (ending with "1956."); ¶5, lines 1–3, 5–7; ¶7, lines 1–3) |
| 306 | 1 (¶5, all; ¶6, all); 2 (¶10, all except name in first line; ¶12, all except same name) |
| 316 | 1 (last five lines) |
| 317 | 1 (¶3, all) |
| 494 | 1, 4 (¶8, all; ¶9, all); 5 (¶16, all; ¶17, all) |
| 495 | 1 (¶2, all except last 14 words) |
| 507 | 1 (¶2(c), all); 2 (¶5(d), all; ¶5(e) |
| F201 | 1 (¶2, all except CIA employees' names) (FBI has apparently withdrawn its assertion of an exemption with respect to ¶1 because this document is not mentioned in the *in camera* affidavits) |
| F354 | 1 (¶4, lines 8–9; ¶6, lines 4–5); 3 (¶1, lines 3–7; ¶5, lines 2–5) |
| F356 | 1 (¶2c, all) |
| S–3 | 2 (¶f, all) |
| S–20 | 2 (¶3, lines 1–4; ¶4, lines 1–2) |

C. The government has not carried its burden with respect to the deletions (other than A, B, and H), and summary judgment is granted to plaintiff with respect to the following:

*Collection 1:*

| | |
|---|---|
| 29 | 1, all |
| 91 | 1, all |

**85.** The CIA may, however, continue to withhold "A" & "B" information.

| | |
|---|---|
| 92 | 1, all |
| 105 | 1, all |
| 110 | 1 & 2, all |
| 140 | 1, all |
| 257 | 1, all |
| 259 | 1, all |
| 419 | 2, all |
| F25 | cover letter and pages 1–7, all; FBI has withdrawn its deletions; two minor CIA deletions not justified |
| F94 | pages 1–7, all; identical report with identical deletions as F25 |

*Collections 12 and 13:*

26, 28, 30, 34, 62, 63, 71, 125, 129,[86] 139,[87] 157,[88] 163, 191, 193, 194, 210,[89] 212, 214, 215, 216, 218, 219, 227, 235, 268, 310, 318, 358,[90] 364,[91] 372, 388, 389, 411, 444, 448, 453, 455, 482,[92] 487, 489, 506, F20, F32, F34, F35, F37, F106, F107, F108, F109, F147, F205, F243, F244,[93] F245, F247, F255, F256,[94] F257, F258, F259, F264,[95] F265, F283,[96] F360, F365.[97]

## Section V

Summary judgment is granted to the CIA and the FBI regarding the treatment the agencies have accorded the following documents:[98]

| Source | Document |
|---|---|
| D(1) | 333 |
| | 385 |
| | 386 |

| Source | Document |
|---|---|
| | F300 |
| | F301 |
| | F302 |
| | F303 |
| | F304 |
| | F305 |
| | F357 |
| D(7) | 147 |
| D(15) | 237 |
| D(16) | F119 |
| D(21) | 136 |
| D(22) | 152 |
| | 166 |
| | 167 |
| | 171 |
| | 178 |
| | 180 |
| | 188 |
| | 224 |
| | 428 |
| | 484 |
| | F103 |
| | F112 |
| | F124 |
| | F126 |
| | F127 |
| | F128 |
| | F130 |
| | F131 |
| | F103 |
| | F141 |
| | F234 |
| | F341 |
| D(23) | 27 |
| | 43 |
| | 49 |
| | 293 |
| | 340 |
| | 342 |

**86.** The Court's ruling applies to paragraphs 3 and 4.

**87.** The CIA may continue to withhold the last word on the second line of ¶ 1.

**88.** The CIA may continue to withhold the description of the source.

**89.** The Court's ruling applies to paragraphs 3 and 4.

**90.** The CIA may continue to withhold the description of the source.

**91.** The CIA may continue to withhold the description of the source.

**92.** The Court's ruling applies to the passages regarding publication of Galindez's book.

**93.** The CIA may continue to withhold the deleted material in ¶ 1, page 1.

**94.** The Court's ruling applies to lines 6 and 7 on page 1.

**95.** The CIA may continue to withhold the description of the source.

**96.** The CIA may continue to withhold the description of the source.

**97.** The CIA may continue to withhold the description of the source.

**98.** In these cases either the CIA has provided the Court with adequate information about the nexus between the information withheld and the reasons for not releasing it, or the source was a diplomat, the individual was a long-term source (not just a one-time "gossip" source), or he has been used relatively recently.

| Source | Document |
|---|---|
| | F219 |
| | F220 |
| | F221 |
| | F342 |
| | F343 |
| | F344 |
| | F362 |
| D(24) | 135 |
| D(30) | 431 |
| | 437 |
| D(32) | F1 |
| | F9 |
| D(34) | 58 |
| | 59 |
| | 75 |
| | 83 |
| | 95 |
| | 106 |
| | 128 |
| | 144 |
| | 354 |
| D(36) | 80 |
| | 81 |
| D(39) | 22 |
| | 23 |
| D(40) | 145 |
| | 159 |
| | 168 |
| | 199 |
| | F22 |
| | F24 |
| | F93 |
| | F96 |
| D(42) | 103 |
| | 205 |
| | 343 |
| | 346 |
| | 347 |
| | F268 |
| | F270 |
| | F274 |
| | F279 |
| | F280 |
| | F282 |
| | F366 |
| D(43) | 165 |
| D(45) | F159 |
| D(47) | F154 |
| | F155 |
| | F156 |
| D(48) | F222 |
| | 223 |
| | 225 |
| | 235 |
| D(49) | 31 |
| | 84 |

| Source | Document |
|---|---|
| | 85 |
| | 89 |
| | 93 |
| | 198 |
| | 234 |
| | 244 |
| | 344 |
| | 345 |
| | 427 |
| | 480 |
| | 481 |
| D(50) | F17 |
| | F39 |
| D(52) | 161 |
| | 353 |
| | 355 |
| | 366 |
| D(54) | 96 |
| | 417 |
| | 418 |
| D(55) | 143 |
| D(56) | F23 |
| | F40 |
| | F41 |
| | F43 |
| | F45 |
| | F46 |
| | F47 |
| D(58) | 131 |
| D(61) | 430 |
| D(62) | 97 |
| | 349 |
| | 360 |

*Collections 3, 4, 5, 6:*

In the following cases the CIA has failed to carry its burden to show that the individual was an intelligence source or that disclosure would harm the national security, and the withheld "D" material shall therefore be released: [99]

| Source | Document |
|---|---|
| D(2) | 269 |
| D(3) | 288 |
| D(4) | 465 |
| D(8) | 230 |
| | 231 |
| | 361 |
| D(9) | 138 |
| D(10) | F363 |
| | 363 |
| | 365 |
| | 190 |
| | 200 |
| D(12) | F122 |
| D(14) | 435 |

99. The CIA may continue to withhold cryptonyms, however, but in those few instances where a cryptonym and the individual's real name appear together in a document, the cryptonym should be replaced with the individual's real name.

| | |
|---|---|
| D(17) | 486 |
| D(25) | 424 |
| D(27) | 117 |
| D(28) | 187 |
| | 189 |
| D(31) | 289 |
| D(33) | 74 |
| D(35) | 88 |
| D(37) | 429 |
| D(38) | 14 |
| D(41) | 94 |
| | 154 |
| | 425 |
| D(44) | F377 |
| | F378 |
| D(51) | 151 |
| D(53) | 37 |
| | 39 |
| | 73 |
| D(55) | 127 |
| | 133 |
| | 134 |
| | 141 |
| | 142 |
| | 292 |
| | 332 |
| | F2 |
| D(57) | 478 |
| D(59) | 162 |
| D(60) | 149 |
| D(63) | S–25 |
| | S–44 |
| | S–45 |

In the following documents the identity of the source is worthy of protection, but CIA has been overinclusive in its deletions, excerpting substantially more than could be used to identify the source.

D(1) 223: release ¶3, ¶4 beginning with "source comment" and ending with "Jesus de Galindez case," next sentence with first 5 words deleted

245: release except for source's name in ¶3 and cryptonym in the last sentence

322: release except for 8 words following date in ¶2

323: replace first "D" with name

334: release except for source's cryptonym

335: release in full; no mention of source's name

D(15) F237: information which would identify source may be withheld

F118: release ¶1 on page 2 except for source's name

D(26) 421: release ¶1 except for first word; release ¶2 except for first 10 words

D(29) 98: release ¶2, ¶3, ¶4, ¶7 starting with 4th word on line 2

D(46) 211: source name may be protected but names of other two persons should be released

222: source name may be protected but names of other two persons should be released

F365: source name may be protected but names of other two persons should be released

### Section VI

*Collections 7 and 8:*

These materials shall be treated as follows:

E(1) 174: one of four paragraphs released; remaining deletions upheld

E(2) 38: all deletions upheld

F361: all deletions upheld

E(3) 461: all deletions upheld

F115: all deletions upheld

462: all deletions upheld

470: all deletions upheld

471: all deletions upheld

473: all deletions upheld

F125: all deletions upheld

E(4) 112: all deletions upheld

E(5) 497: release 1 (¶2, all); 2 (¶s 2, 3, 4 all)

498: release ¶s 3, 4, 5, 6 with cryptonyms deleted

E(6) 119: release except for ¶1, last word on line 3, first word on line 4, last 5 words on line 9; ¶2 may withhold first 2 words on line 5; ¶3 may withhold last two words on line 5; ¶4 may withhold fourth word on line 2

124: release except for first four words in paragraph

E(7) 181: deletions upheld

229: deletions upheld

416: deletions upheld

E(8) 126: deletions upheld

150: deletions upheld

158: deletions upheld

415: deletions upheld except for privacy information

426: deletions upheld except for privacy information

E(9) 400: release

E(10) F192: release except for name of individual who made documents available

F194: release except for name of individual who made documents available

E(11) 436: release
E(12) 207: deletions upheld
E(13) F306: deletions upheld
 F307: deletions upheld
E(14) F3: deletions upheld
 F5: deletions upheld
 F6: deletions upheld
 F89: deletions upheld
 F314: deletions upheld
E(15) F145: deletions upheld
 F146: deletions upheld
 F197: deletions upheld
E(16) 201: deletions upheld
 211: deletions upheld
 F324: deletions upheld
E(17) 312: deletions upheld
 373: deletions upheld
 374: deletions upheld
 F335: deletions upheld
E(18) S–14: deletions upheld
 S–15: release
 S–16: deletions upheld
 S–18: deletions upheld
 S–19: deletions upheld
 S–21: deletions upheld
 S–22: release
E(19) dealt with in footnote in text -- deletions upheld