**John R. KNIGHT, Plaintiff–Appellant,**

v.

**UNITED STATES CENTRAL INTELLIGENCE AGENCY, Defendant–Appellee.**

**No. 88–2735.**

United States Court of Appeals, Fifth Circuit.

May 10, 1989.

John R. Knight, Houston, Tex., pro se.

Hays Jenkins, Jr., Asst. U.S. Atty., Frank A. Conforti, Chief, Civil Div., Henry K. Oncken, U.S. Atty., Houston, Tex., for defendant-appellee.

Before GARZA, JOLLY and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Pursuant to a Freedom of Information Act ("FOIA") request, John R. Knight sought from the CIA classified material relating to the sinking of the GREENP-

---

EACE vessel RAINBOW WARRIOR in the harbor of Auckland, New Zealand, on July 10, 1985. Because in *CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985), the Supreme Court held that 50 U.S.C. § 403(d)(3) is a withholding statute empowering the Director of Central Intelligence ("DCI") to exempt from FOIA disclosure material that could compromise intelligence sources and methods, and since the DCI withheld the documents sought specifically on that basis, we affirm the district court's grant of summary judgment in favor of the CIA.

## I

This lawsuit concerns Knight's FOIA request, dated October 4, 1985, which requested from the CIA five categories of documents relating to the sinking of the GREENPEACE vessel RAINBOW WARRIOR. The vessel exploded and sank in the harbor at Auckland, New Zealand, on July 10, 1985. This incident was widely reported when it occurred, and sparked international controversy when it was discovered that the explosion was caused by the detonation of explosive charges attached to the ship's hull.

GREENPEACE is a well-known international organization that pursues a variety of environmental and pacifist causes. The organization has been noted for its efforts to save marine wildlife, and to stop the testing and development of nuclear weapons, among other causes. At the time it was sunk, the RAINBOW WARRIOR was in New Zealand preparing to sail to the vicinity of Muraroa atoll in French Polynesia to monitor and protest a scheduled French nuclear test. The French government denied any official involvement in the incident and denials of responsibility for the sinking of the vessel continued into September 1985. On September 22, 1985, however, the French prime minister publicly admitted that the two French intelligence agents had been responsible for the sinking of the RAINBOW WARRIOR, and that they had been acting under orders in so doing. It was further disclosed that the initial French official investigation into the affair had been less than candid, and that the responsibility for having ordered the attack rested within very senior levels of the French government. As a result of these revelations, both the Minister of Defense and the director of the French intelligence service responsible were replaced. Thus, by the time Knight filed his FOIA request with the CIA on October 4, 1985, the French government had admitted full culpability in, and responsibility for, the sinking of the RAINBOW WARRIOR.

The CIA, however, refused to release any portion of any document related to the incident to Knight, pursuant to his FOIA request, on grounds that the documents were important to United States national security. Other agencies of the government, however, did release documents responsive to Knight's request. Specifically, by correspondence dated November 25, 1986, the Defense Intelligence Agency ("DIA") released to Knight portions of three responsive documents that had been forwarded to it for review and handling by the CIA; and by correspondence dated September 1, 1987, the State Department released to Knight most of one responsive document that had been similarly forwarded by the CIA. In withholding from release only portions of their documents responsive to Knight's FOIA request, the DIA and the State Department invoked the same "national security" exemption that the CIA invoked in denying any disclosure or responsive documents whatsoever.

The CIA continues to refuse to release any document or any portion of any document in response to Knight's FOIA request.

## II

Against this background has occurred the procedural maneuvering that provides the essence of this litigation. First, of course, Knight filed his FOIA request seeking access to all documents relating to the sinking of the RAINBOW WARRIOR. After the CIA informed Knight that it could release no documents, Knight moved the district court to compel preparation of a *Vaughn* index, so-called because in

*Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), the D.C. Circuit required a government agency to formulate a system of itemizing and indexing that would correlate each document or part of a document the agency sought to withhold with the specific justification for withholding it.

In response, the defendant CIA agreed to file a *Vaughn* index and did file affidavits (the "Saderholm and Dyer declarations"), which supplied justifications for withholding the documents. The Saderholm declaration discussed eight "finished intelligence documents" responsive to Knight's FOIA request, while the Dyer declaration addressed an unstated number of additional responsive documents. The documents themselves were not disclosed to Knight. The CIA also requested permission to prepare and present to the court for its *ex parte, in camera* review a classified declaration (the "Carle declaration") which it assured would further describe the documents requested and therefore assist the court in determining whether they were correctly withheld. The magistrate entered an order directing the CIA to prepare such a classified supplemental *Vaughn* index and the CIA did so.

After the CIA moved for summary judgment, alleging that its unclassified affidavits entitled it to judgment as a matter of law, Knight moved for partial summary judgment, alleging that the unclassified affidavits were inadequate for the *Vaughn* index and that, in any case, he was entitled to judgment as a matter of law because the CIA could not claim legitimately that the documents were exempt from disclosure under the FOIA. The district court agreed that the Saderholm and Dyer declarations constituted an inadequate *Vaughn* index because they did not describe with sufficient particularity the documents that were withheld nor did they describe how they affected national security. The district court therefore reviewed the documents *in camera* to determine whether the information was properly withheld. After reviewing the documents, the district court decided that they were properly withheld, pre-sumably, although not explicitly, on the basis that the documents were properly exempted from disclosure under § 552(b)(1) and (3) of the FOIA. The district court therefore granted the CIA's motion for summary judgment and denied Knight's motion for partial summary judgment. Knight appeals that ruling.

### III

Knight contends that in granting summary judgment in the CIA's favor on an admittedly inadequate public record, and without explanation, the district court erred in at least four ways.

First, Knight argues that the court should not have permitted the CIA to litigate this matter on the basis of an inadequate public record. As a result, Knight contends he was denied a meaningful opportunity to participate in this litigation effectively.

Second, Knight argues that the CIA's assertion that national security concerns were implicated defies common sense and appears wholly at odds with the standards that govern the exemptions invoked.

Third, Knight asserts the district court failed to address whether portions of the documents at issue were segregable and therefore required to be released pursuant to his FOIA request.

Finally, Knight maintains that the district court erred in granting summary judgment because there remained in dispute a genuine issue of material fact as to the responsive documents not tendered for *in camera* review by the National Security Council. The government, he says, initially admitted the existence of such documents, but then repudiated its admission in an *ex parte* contact with the court. Whether these additional responsive documents exist is a material issue of fact about which there was a clear dispute and granting summary judgment was therefore inappropriate.

### IV

Notwithstanding Knight's statement of the issues, we must confront a threshold

issue: that is, whether, when the DCI makes a judgment that documents could reveal intelligence sources and methods, the courts may, in the absence of evidence of bad faith, effectively go behind that judgment and order him to produce what he has determined to be exempt for reasons of national security. Because we perceive the answer to be in the negative, we need go no further.

## V

The Supreme Court's decision in *CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985), controls our decision today. As the Supreme Court noted in *Sims*, section 102(d)(3) of the National Security Act of 1947, codified at 50 U.S.C. § 403(d)(3), makes the DCI "responsible for protecting *intelligence sources and methods* from unauthorized disclosure." (Emphasis supplied.) The *Sims* Court considered whether this statute requiring the DCI to protect intelligence sources and methods qualified as a withholding statute under 5 U.S.C. § 552(b)(3)(B), one of the specific FOIA exemptions, and thus rendered the material protected pursuant thereto exempt from FOIA disclosure. Section 552(b)(3) in relevant part reads as follows:

> (b) [The general FOIA disclosure requirement] *does not apply* to matters that are—
>
> . . . .
>
> (3) *specifically exempted from disclosure by statute* (other than section 552(b) of this title), *provided that such statute* ... (B) establishes particular criteria for withholding or *refers to particular types of matters to be withheld;* (emphasis added).

The Supreme Court concluded that 50 U.S.C. § 403(d)(3) does qualify as a withholding statute under the language of 5 U.S.C. § 552(b)(3)(B), because section 403(d)(3) requires the DCI to protect certain material from unauthorized disclosure, and it refers to "particular types of matters to be withheld," namely "intelligence sources and methods."

Having established the principle, the Court then turned to the specific question whether the names of institutions and individuals who performed research on a project financed by the CIA were exempt from FOIA disclosure because the DCI asserted that disclosing the names might reveal intelligence sources and methods. The Court observed that when Congress in section 403(d)(3) imposed upon the DCI the responsibility to protect intelligence sources and materials, it also conferred upon him "wide-ranging authority" to protect sources and methods. *Id.* 471 U.S. at 177, 105 S.Ct. at 1892 (quoting *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (per curiam)). Such broad discretion is justified, the Court said, because even the most apparently innocuous sources and prosaic methods can yield valuable intelligence. *Sims*, 471 U.S. at 169–73, 105 S.Ct. at 1888–90. " '[W]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.' " *Id.* at 178, 105 S.Ct. at 1892 (quoting *Halkin v. Helms*, 598 F.2d 1, 9 (D.C.Cir.1978)). Since exposure to public view can compromise and endanger intelligence sources and methods, insuring continued collection of intelligence requires that the DCI be able to decide which of his sources and methods deserve protection from public view. *Id.*, 471 U.S. at 180, 105 S.Ct. at 1893–94. The Court wrote unequivocally, "[I]t is the responsibility of the Director of Central Intelligence, not of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *Id.* The *Sims* Court thus concluded that the DCI had acted within the broad discretion given him by section 403(d)(3) in withholding the names sought, and that the names were therefore exempt from FOIA disclosure under section 552(b)(3)(B).

Given the Supreme Court's broad holding in *Sims*, we conclude that the CIA must prevail here. In the Saderholm declaration,

the CIA's acting information review officer, the DCI's designee, maintains that none of the eight documents referred to therein can be disclosed because disclosure would compromise sources and methods. Typical of the entries in the Saderholm declaration is the following:

*Document No. 2.*

This one-page document is an excerpt from the cable form of the *East Asia Brief* 85–185. This excerpt contains sensitive, finished foreign intelligence concerning political matters in a particular part of the world. *Knowledgeable individuals could recognize from the specific information provided the possible identity of the source and the methods whereby the information was obtained. See* paragraphs 14–21, above.

I have determined that release of this information reasonably could be expected to cause serious damage to the national security. Therefore information contained in this document is currently and properly classified at the SECRET level and is exempt from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3) [50 U.S.C. section 403(d)(3) and section 403g]. *See* paragraphs 7–12, above.

(Emphasis supplied.) Paragraphs 14–21 referred to in the first paragraph of the entry explain, in very general terms, why disclosure of this document and the other seven documents listed in the Saderholm declaration could compromise intelligence sources and methods and thus fall within the exemption of 5 U.S.C. § 552(b)(3). Paragraphs 7–12 explain that the documents were properly classified according to an Executive Order and thus do not pertain to our discussion of 5 U.S.C. § 552(b)(3).

In the Dyer declaration, the Agency's information review officer, the DCI's permanent designee, attests that he has found additional relevant documents but that their disclosure could injure intelligence collection capabilities by compromising sources and methods. That document reads in relevant part as follows:

4.... After careful consideration and for the reasons set forth below, I have personally determined that the public disclosure of the precise number and dates of these remaining documents could reasonably be expected to cause damage to the national security. Accordingly, I cannot provide a listing or description of these documents on the public record.... In summary, it is impossible to specify the exact number of other documents without risking the disclosure of United States capabilities and intelligence sources or methods.

Dyer declined to reveal the dates or any further description of the documents for the same reasons.

In our view, *Sims* stands for the proposition that because 50 U.S.C. § 403(d)(3) is a withholding statute under the FOIA (5 U.S.C. § 552(b)(3)(B)), the FOIA simply does not apply to material the DCI specifically has exempted on the ground that it pertains to or could give rise to inferences about intelligence sources and methods. Thus, under *Sims*, it is sufficient that the DCI has determined, within the discretion given him by 50 U.S.C. § 403(d)(3), that each of the classified documents sought could reveal intelligence sources and methods and thus must be protected. Once the DCI makes that determination, the Supreme Court effectively held, the matter is beyond the purview of the courts. "The decisions of the [DCI], who must, of course, be familiar with the whole picture, as judges are not, are worthy of great deference given the magnitude of the national security interests and the potential risks at stake." *Sims*, 471 U.S. at 179, 105 S.Ct. at 1893. We as a court are unwilling to second guess the DCI or his designees on these matters in the absence of evidence of bad faith.

We should observe that in this case there is no evidence of, or even an explicit allegation of, bad faith. However, to the extent that it is suggested that the allegedly overbroad or far-fetched justification for withholding these documents is evidence of bad faith, we view that as no more than an extended exercise of the CIA's broad discretion acknowledged by the Supreme Court in *Sims*, not as bad faith. As we have already noted, what may seem over-

broad or even trivial to us "may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *Id.*, 471 U.S. at 178, 105 S.Ct. at 1892 (citations omitted). Second, with regard to the CIA's insistence on withholding documents when the State Department and the DIA released documents pertaining to the same subject, we do not believe that the DCI abuses his broad discretion in making a judgment different from that of other agencies in government. He, and not the DIA or the State Department, is entrusted with the final responsibility for protecting intelligence sources and methods, and consequently he is fully entitled, within his discretion, to reach a different conclusion as to national security significance concerning the same document. Finally, we are not persuaded that the CIA acted in bad faith when it "initially admitted the existence of [responsive National Security Council] documents, but then repudiated its admission in an *ex parte* contact with the court." This matter was clearly before the district court, and the district court obviously credited the CIA's assertion that it had made a "simple misstatement." There is nothing in the record before us that would suggest that the district court was clearly erroneous in this conclusion.

### VI

In conclusion, we hold that the documents are exempt from FOIA disclosure. This is so because the DCI determined, with full authority to do so, that the release of the documents could compromise intelligence sources and methods. In the absence of bad faith, or some other compelling showing that he has abused his broad discretion, his determination may not be second-guessed by the courts. There is no such evidence here. The judgment of the district court is therefore

AFFIRMED.