Alan L. FITZGIBBON, Appellant,

v.

CENTRAL INTELLIGENCE
AGENCY, et al.

Alan L. FITZGIBBON

v.

CENTRAL INTELLIGENCE AGENCY,
et al., Appellants.

Nos. 89–5213, 89–5214.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 17, 1990.

Decided Aug. 14, 1990.

Stephen M. Cutler, with whom Stephen P. Doyle was on the brief, for appellant in No. 89–5213 and appellee in No. 89–5214.

Freddi Lipstein, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, were on the brief, for appellees in No. 89–5213 and appellants in No. 89–5214. Sharon Cohen, Asst. U.S. Atty., also entered an appearance for appellees.

757

Before RUTH BADER GINSBURG, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Jesus de Galindez, a Basque exile and a critic of the Trujillo regime in the Dominican Republic, was last seen outside a New York City subway station in 1956. Thereby hangs a lengthy tale. For the reasons stated below, we conclude that the defendant agencies prevail both as appellees and cross-appellants in these Freedom of Information Act cases. We therefore affirm in part, reverse in part, and remand to the District Court with instructions to dismiss.

I. BACKGROUND

Alan Fitzgibbon is an historian studying the disappearance (and presumed death) of Jesus de Galindez. In December of 1974, Fitzgibbon filed requests with the Central Intelligence Agency ("CIA" or "the Agency") and the Federal Bureau of Investigation ("FBI" or "the Bureau") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1988), for information those agencies possessed concerning Galindez. By the end of 1978, the CIA had identified some 551 documents that were responsive to Fitzgibbon's request. Twenty-one of these documents were released in their entirety; the CIA withheld the remaining documents in whole or in part, citing FOIA exemptions 1, 3, and 6.[1] The FBI referred to the CIA some 376 documents that either

contained CIA documents or had originated with the Agency. The CIA determined that most of these referred documents also fell within exemptions 1, 3, and 6. The Bureau also withheld certain documents under exemption 7(C).[2]

In April of 1979, Fitzgibbon filed this lawsuit, seeking release of the withheld materials. The District Court ordered the defendants to submit a *Vaughn* index, which they did. See *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973) (ordering government agency to submit index itemizing the particular FOIA exemptions claimed for each requested document), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In April of 1981, the District Court denied the agencies' motion for summary judgment, found that the justifications in the public *Vaughn* index were insufficient, and selected 89 documents as to which the CIA and FBI were to submit *in camera* affidavits setting forth "all facts relevant to the claimed exemptions from disclosure with as much specificity as possible." Mem.Op. of 10 February 1981 at 8, JA at 1115.

II. THE DISTRICT COURT DECISIONS

The District Court issued its memorandum and order in November of 1983. See *Fitzgibbon v. CIA*, 578 F.Supp. 704 (D.D.C. 1983). The District Court held that the Agency could withhold information that would disclose sensitive relationships with foreign intelligence services. *Id.* at 712–13. The District Court distinguished, however, between information concerning such liaisons and what it considered to be "nonsen-

---

**1.** Exemption 1 to the FOIA, 5 U.S.C. § 552(b)(1)(A) & (B), provides that FOIA's disclosure requirement "does not apply to matters that are specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order."

Exemption 3, 5 U.S.C. § 552(b)(3)(A) & (B), exempts items "specifically exempted from disclosure by statute ... provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matters to be withheld."

Exemption 6, 5 U.S.C. § 552(b)(6), exempts material contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The CIA has subsequently determined that certain material previously withheld under this privacy exemption is to be released.

**2.** Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), allows an agency to decline to disclose "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy."

sitive contacts between the CIA and foreign or domestic officials, and the reporting of information about third parties." *Id.* at 713. As an example of such nonsensitive disclosable materials, the District Court pointed to deletions concerning the Agency's apparent efforts, on behalf of the Paris-based Basque government-in-exile, to obtain Galindez's papers from the New York Police Department ("NYPD"). *Id.* The District Court essentially found that relations with foreign intelligence *services* merit greater protection than relations with individual *sources. Id.* at 713 n. 22.

After considering information that the CIA had withheld concerning particular CIA station locations, the District Court concluded that such information was protectable with the exception of one former location. Information concerning that one former station was "publicly available," the District Court decided, within the meaning of *Afshar v. Department of State,* 702 F.2d 1125, 1133 (D.C.Cir.1983), and the right to exempt that information from disclosure had effectively been waived, because the existence of that station had been acknowledged in a 1975 congressional committee report. *Fitzgibbon,* 578 F.Supp. at 715. The documents requested did not treat the same time frame as the period covered by the congressional report, and *Afshar* itself had noted that its rule would not require recognition of a waiver when an official acknowledgment was being used to uncover information relating to a *later* time period. *See Afshar,* 702 F.2d at 1133. The District Court nonetheless concluded that there was no preclusion of waiver for information concerning an *earlier* time period. *Fitzgibbon,* 578 F.Supp. at 715 n. 30.

The District Court next considered four groups of documents that contained deletions justified on the ground of protection of intelligence sources (that is, exemption 3). Relying on this Court's definition of "intelligence source" in *Sims v. CIA,* 642 F.2d 562, 571 (D.C.Cir.1980), *rev'd,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985), the District Court held that the CIA could not protect "unwitting" or "potential" sources. *Fitzgibbon,* 578 F.Supp. at 717–18. Because there was a public interest in

the Galindez case, and because the Agency was investigating "the disappearance of an American citizen and the death of another," *id.* at 721, rather than engaging in covert operations, the District Court ordered the disclosure of some 47 deletions that the Agency claimed identified sources and 13 instances of information provided by sources. *Id.* at 727–33 (appendix). The District Court also held that the CIA could not withhold information for which it had claimed an exemption as indicative of intelligence methods because the Agency had attempted to hide "information so basic and innocent that its release could not harm the national security or betray a CIA method." *Id.* at 722.

Finally, the District Court compelled disclosure of only two FBI documents. In the first document, the Bureau declined to disclose the name of an individual whose name appeared in a report which contained no other information about that person. The District Court concluded that the mere mention of a name in an FBI report, when considered in the context of the wide-ranging Galindez investigation, could hardly establish a sufficient invasion of privacy to overcome the public interest in disclosure. *See id.* at 723–24. The second document concerned one Stanley Ross, a New York publisher. Because the personal events discussed in that report occurred more than a decade before the Galindez affair, the FBI had claimed that the information was exempt, a rationale that the District Court did not credit because "more opprobrious" information about Ross had already been cleared. *Id.* at 724.

Upon the CIA's motion for reconsideration, the District Court sustained a number of exemption claims that it had previously rejected, but it essentially reaffirmed its memorandum and order of November 1983. *See* Mem.Op. of 5 July 1984 at 2 & n. 2, JA at 1304 & n. 2. Both parties appealed from both rulings, and we held the appeals in abeyance pending the Supreme Court's resolution of *Sims.* After the Supreme Court reversed, *see CIA v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985), we remanded to the District Court for recon-

sideration in light of the Supreme Court's opinion. *Fitzgibbon v. CIA,* Nos. 79–0956 and 84–5632 (D.C.Cir. March 13, 1986) (order), JA at 1315.

On remand, the District Court largely overturned its earlier disclosure orders. *See* Mem.Op. of 19 May 1989, JA at 1316. The District Court read *Sims* as allowing the Director of Central Intelligence very broad authority to protect intelligence sources, as refuting this Court's earlier "crabbed reading" of 50 U.S.C. § 403(d)(3),[3] and as doing so in quite sweeping language; it therefore concluded that it was "limited to determining whether that information [on sources and methods and withheld under exemption 3] was needed to fulfill the Agency's statutory obligations with respect to foreign intelligence." *Id.* at 7–8, JA at 1322–23.

Following the lead of *Sims,* the District Court proceeded to reject its prior disclosure order concerning intelligence sources and methods, as well as its order of disclosure concerning relationships with foreign intelligence services, with the exception of those deletions asserted to protect domestic intelligence sources. Such domestic sources were to be disclosed, the District Court concluded, because the Supreme Court in *Sims* recognized that information, if it is to be protected, "must fall within the 'Agency's mandate to conduct *foreign intelligence.*'" Mem.Op. of 19 May 1989 at 15, JA at 1330 (citing *Sims,* 471 U.S. at 169, 105 S.Ct. at 1888) (emphasis supplied by the District Court). Reasoning that CIA contacts with domestic officers and agencies, such as the NYPD, fall beyond the pale of that mandate, the District Court ordered disclosure of such contacts. *Id.* The District Court also reaffirmed its earlier order compelling disclosure of the location of a particular CIA station, rejecting the CIA's arguments that release by the Agency is different from release through a congressional report and that the information at issue involved a different time frame than the information previously released. *Id.* at 16–18, JA at 1331–33.

The parties now appeal and cross-appeal. Fitzgibbon appeals the District Court's order of 19 May 1989. The CIA and FBI appeal all three orders (10 November 1983, 5 July 1984, and 19 May 1989).

## III. ANALYSIS

### A. *Fitzgibbon's Appeal*

Fitzgibbon argues that the District Court erred in its order of 19 May 1989 because it failed to make an express finding that disclosure of the material withheld would compromise an intelligence source or method. At least with respect to material that does not explicitly identify a source, he claims, disclosure of the material could not result in disclosure of the source because it is not clear from such material how the information was derived: "[I]t might have '"come from a periodical, newspaper, FBI file, confidential source, or CIA employee as from a specific foreign intelligence service."'" Brief for Fitzgibbon at 22 (quoting Mem.Op. of 19 May 1989 at 16, JA at 1331). Fitzgibbon also claims that insofar as the material involves what the District Court had earlier described as "nonsensitive contacts" between CIA and foreign officers, such information would not disclose intelligence sources and methods even under *Sims* because the requested information deals with the Agency's domestic actions on behalf of the Basque government-in-exile. Fitzgibbon would have us conclude that such information does not fall within the CIA's "mandate to conduct foreign intelligence," *see Sims,* 471 U.S. at 169, 105 S.Ct. at 1888, and therefore should be disclosed.

Fitzgibbon also attacks the District Court's decision to exempt from disclosure certain material that it had previously termed "so basic and innocent that its release could not harm the national security or betray a CIA method." *Fitzgibbon,* 578 F.Supp. at 722; *compare* Mem.Op. of 19 May 1989 at 2, JA at 1338. If material cannot betray a method, he argues, then it

---

**3.** Section 102(d)(3) of the National Security Act of 1947 is codified at 50 U.S.C. § 403(d)(3) and provides, in relevant part, "[t]hat the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure."

must be disclosed. Even if it did betray a method, he claims, disclosure would still be warranted where the information was already in the public domain as the subject of an official disclosure within the meaning of *Afshar*, 702 F.2d at 1130–31. Thus, where the source's identity is not apparent from the document, Fitzgibbon urges us to conclude that release of the document would not—indeed, as a matter of law, could not—result in an unauthorized disclosure of a source. Where the source has been publicly identified, he claims, *Afshar* requires release of that information. Brief for Fitzgibbon at 23–25.

The District Court also allowed the CIA to withhold or delete material revealing potential sources. Fitzgibbon claims that this ruling went far beyond the bounds of both *Sims* and section 102(d)(3) of the National Security Act. The rationale of the need of the Agency and its sources for confidentiality simply does not apply where merely a *potential* source is at issue, Fitzgibbon argues. Finally, Fitzgibbon protests the District Court's refusal of his invitation to consider the effect of the passage of time on the materials withheld, *see* Mem.Op. of 19 May 1989 at 10, JA at 1324–25, arguing that security concerns become attenuated with the passage of time and that any other rule allows "the government an impenetrable cloak of secrecy." Brief for Fitzgibbon at 29.

Whatever merits Fitzgibbon's appeal may have had in the past have been vaporized by the unequivocal sweep of the Supreme Court's decision in *Sims*. Before turning to the specifics of Fitzgibbon's argument, therefore, it is appropriate to examine both *Sims* and the applicable standard of review.

### 1. *Sims*

Between 1953 and 1966, certain individuals and educational institutions participated in CIA-funded research. This research focused on the possibility of using chemical, biological and radiological materials in Agency clandestine operations. The project was code-named MKULTRA, and both its nature and its sponsor were kept

secret, even from the individual researchers. In response to a FOIA request, the CIA declined to disclose the names of any individuals involved and disclosed only the names of those institutions that did not object. As a basis for withholding this information, the Agency invoked 50 U.S.C. § 403(d)(3) and exemption 3. *Sims,* 471 U.S. at 161–63, 105 S.Ct. at 1883–85.

In *Sims,* as here, a primary question was the definition of the term "intelligence source." We had defined an intelligence source as

a person or institution that provides, has provided, or has been engaged to provide the CIA with information of a kind the agency needs to perform its intelligence function effectively, yet could not reasonably expect to obtain without guaranteeing the confidentiality of those who provide it.

*Sims,* 642 F.2d 562, 571 (D.C.Cir.1980), *rev'd,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). The Supreme Court found that our "crabbed reading of the statute contravenes the express language of § 102(d)(3), the statute's legislative history, and the harsh realities of the present day." *Sims,* 471 U.S. at 174, 105 S.Ct. at 1890. By passage of the National Security Act of 1947, "the Agency was expressly entrusted with protecting the heart of all intelligence operations—'sources and methods,'" *id.* at 167, 105 S.Ct. at 1887; indeed, "Congress entrusted this Agency with sweeping power to protect its 'intelligence sources and methods.'" *Id.* at 169, 105 S.Ct. at 1887. *See also id.* at 177, 105 S.Ct. at 1892 (quoting *Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (*per curiam*)) ("The 'statutory mandate' of § 102(d)(3) is clear: Congress gave the Director [of Central Intelligence] wide-ranging authority to 'protec[t] intelligence sources and methods from unauthorized disclosure.'"). The Supreme Court noted that our original definition of intelligence source "ignore[d] the realities of intelligence work, which often involves seemingly innocuous sources as well as unsuspecting individuals who provide valuable intelligence information." *Id.* 471 U.S. at 176, 105 S.Ct. at 1891.

Relying on this broad statutory authority, and mindful of "the practical necessities of modern intelligence gathering," *id.* at 169, 105 S.Ct. at 1887, the Supreme Court held that the proper reading of the statute is that "[a]n intelligence source provides, or is engaged to provide, information the Agency needs to fulfill its statutory obligations." *Id.* at 177, 105 S.Ct. at 1892. *See also id.* at 169–70, 105 S.Ct. at 1888 (noting that intelligence sources "provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence"). The MKULTRA researchers provided such information, the Court held, and therefore the Agency was justified in withholding their names. *Id.* at 177, 105 S.Ct. at 1892.

In the course of reaching its conclusion, the Supreme Court decided that we had "underestimated the importance of providing intelligence sources with an assurance of confidentiality that is as absolute as possible.... If *potentially valuable* intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place." *Id.* at 175, 105 S.Ct. at 1891 (emphasis supplied). As to the competence of any court to pass on the nature, value, and exposure of any intelligence source, potential or otherwise, the Court noted:

> We seriously doubt whether a *potential* intelligence source will rest assured knowing that judges, who have little or no background in the delicate business of intelligence gathering, will order his identity revealed only after examining the facts of the case to determine whether the Agency actually needed to promise confidentiality in order to obtain the information.... [A] court's decision whether an intelligence source will be harmed if his identity is revealed will often require complex political, historical, and psychological judgments. There is no reason for a *potential* intelligence source, whose welfare and safety may be at stake, to have great confidence in the ability of judges to make those judgments correctly.

*Id.* at 176, 105 S.Ct. at 1891 (citation omitted) (emphasis supplied).

### 2. Standard of Review for Exemption 3

■ In examining the FOIA request made in *Sims,* the Supreme Court engaged in a two-prong review. First, is the statute in question a statute of exemption as contemplated by exemption 3? *See Sims,* 471 U.S. at 167, 105 S.Ct. at 1886. Second, does the withheld material satisfy the criteria of the exemption statute? In *Sims,* the Court decided that section 403(d)(3) is an exemption statute because it refers to "particular types of matters" that are to be withheld. *Id.* at 167, 105 S.Ct. at 1887. *See* 50 U.S.C. § 403(d)(3); 5 U.S.C. § 552(b)(3)(B). This conclusion is supported by the plain meaning of the statute, by the legislative history of FOIA, and by every federal court of appeals that has considered the matter. *See Sims,* 471 U.S. at 167–68 & n. 12, 105 S.Ct. at 1887 & n. 12; *Miller v. Casey,* 730 F.2d 773, 777 (D.C.Cir. 1984); *Gardels v. CIA,* 689 F.2d 1100, 1103 (D.C.Cir.1982); *Halperin v. CIA,* 629 F.2d 144, 147 & n. 7 (D.C.Cir.1980); *National Comm'n on Law Enforcement and Social Justice v. CIA,* 576 F.2d 1373, 1376 (9th Cir.1978). There is thus no doubt that section 403(d)(3) is a proper exemption statute under exemption 3.

■ As we proceed to consider Fitzgibbon's appeal under the second *Sims* prong—does the material meet the statutory criteria?—we must bear in mind, as we have recently noted, that "[e]xemption 3 presents considerations distinct and apart from the other eight exemptions." *Association of Retired R.R. Workers v. United States R.R. Retirement Bd.,* 830 F.2d 331, 336 (D.C.Cir.1987). As we said in *Retired Railroad Workers:*

> "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's

coverage." The required scope of review is further narrowed in the case of statutes falling within B–2 [the second part of exemption 3, that the statute "refers to particular types of matters to be withheld"] because the congressional intent to withhold is made manifest in the withholding statute itself.

*Id.* at 336 (quoting *Goland v. CIA*, 607 F.2d 339, 350 (D.C.Cir.1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980)). Thus, with respect to Fitzgibbon's exemption 3 claim, our task is to determine whether or not the material withheld falls within the exemption claimed—*i.e.*, whether it relates to intelligence sources and methods. *See Knight v. CIA*, 872 F.2d 660, 664 (5th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 474 (1990); *Miller*, 730 F.2d at 776; *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). In the course of discharging this task, naturally, we accord substantial weight and due consideration to the CIA's affidavits. *See King v. Department of Justice*, 830 F.2d 210, 217 (D.C.Cir. 1987); *Goldberg v. Department of State*, 818 F.2d 71, 77 (D.C.Cir.1987), *cert. denied*, 485 U.S. 904, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988); *Miller*, 730 F.2d at 776.

### 3. *Fitzgibbon's Claims in Light of* Sims

*Sims* invalidates all of Fitzgibbon's claims. First, as noted above, Fitzgibbon asserts that publication of much of the withheld material would not disclose a source because it is unclear from the information whence it was derived; it may as well have come from a magazine or newspaper, or a CIA or FBI employee, as from a foreign intelligence service. Brief for Fitzgibbon at 22. The Supreme Court has unequivocally held that the Director of Central Intelligence may protect all intelligence sources, regardless of their provenance. *Sims*, 471 U.S. at 171, 105 S.Ct. at 1888. Similarly, the fact that the District Court at one point concluded that certain contacts between CIA and foreign officials were "nonsensitive" does not help Fitzgibbon because apparently innocuous information

can be protected and withheld, *id.* at 176, 105 S.Ct. at 1891, and because the Supreme Court has indicated that information from ordinary private citizens—information derived from contacts that are as "nonsensitive" as any imaginable—is a vital part of the Agency's congressionally-mandated function and indeed composes " 'one of the greatest repositories of intelligence that we have.' " *Id.* at 171, 105 S.Ct. at 1889. *See also id.* at 171–72, 105 S.Ct. at 1888–89 ("General Vandenberg spoke of 'the great open sources of information upon which roughly 80 percent of intelligence should be based,' and identified such sources as 'books, magazines, technical and scientific surveys, photographs, commercial analyses, newspapers, and radio broadcasts, and general information from people with knowledge of affairs abroad.' ").

Second, the District Court committed no error when, in light of *Sims*, it reversed its prior disclosure orders concerning information, related to intelligence methods, that the District Court had earlier considered "so basic and innocent that its release could not harm the national security or betray a CIA method." *Fitzgibbon*, 578 F.Supp. at 722. The *Sims* Court stated that, along with sources, methods constitute "the heart of all intelligence operations." *Sims*, 471 U.S. at 167, 105 S.Ct. at 1887. It is not the province of the judiciary, the Supreme Court emphasized, to determine whether a source or method should be (or should not be) disclosed:

> [I]t is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process.

*Sims*, 471 U.S. at 180, 105 S.Ct. at 1893–94. In this case, the Director of Central Intelligence attested that

> [s]ix foreign intelligence services are directly involved, including services of both allied and non-allied countries.... [Disclosure] would significantly reduce the quantity of substantive intelligence infor-

mation provided to this Agency inasmuch as other nations will not entrust their most sensitive secrets to an organization unable to protect them. The loss of the information and assistance that these services provide to the United States would substantially damage United States security interests.

JA at 1299.

Third, Fitzgibbon's argument that methods that might be generally known—such as physical surveillance, or interviewing, or examination of airline manifests—must be disclosed, see Brief for Fitzgibbon at 24–26 & n. 22, fails for the same reason. As the Supreme Court said in *Sims*, "[a] foreign government can learn a great deal about the Agency's activities by knowing the public sources of information that interest the Agency." *Sims*, 471 U.S. at 176–77, 105 S.Ct. at 1891–92. This Court has established that in considering the potential harm arising from disclosure of a source or method, " '[w]e must take into account ... that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself.' " *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C.Cir.1982) (quoting *Halperin v. CIA*, 629 F.2d 144, 150 (D.C.Cir.1980)). As the Director of Central Intelligence attested to the District Court:

> [D]isclosure [of intelligence methods] would directly permit hostile governments to either neutralize [the disclosed methods] or utilize them as a vehicle for disinformation. Hostile intelligence services and governments are not omnipotent; they cannot watch all potential sources and guard against all possible methods of collection. For example, the procedure of monitoring international telecommunications is one of the most simple intelligence collection methods, but its superb utility stems from the sole fact that hostile powers do not know which communications are seized and which channels are open to compromise. Therefore, protection of the fact of CIA use of even the simplest methods in certain situations keeps this Nation's adver-

saries guessing as to the goals of United States intelligence activities and the means of carrying them out.

JA at 1300–01.

Fourth, Fitzgibbon's contention that unwitting or potential sources must be disclosed. Brief for Fitzgibbon at 26–28, cannot stand after *Sims*. Because the existence of the MKULTRA program was a closely kept secret, the researchers in *Sims* were obviously unwitting sources. In a literal sense, Fitzgibbon is correct in noting that all persons are *potential* sources, yet his argument proves too much, as the Supreme Court noted in *Sims*: "If *potentially* valuable intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place." *Sims*, 471 U.S. at 175, 105 S.Ct. at 1891 (emphasis supplied). *See also id.* at 176, 105 S.Ct. at 1891 ("We seriously doubt that a *potential* intelligence source will rest assured.... There is no reason for a *potential* intelligence source to have great confidence in the ability of judges...."). Moreover, refining distinctions between and making comparative evaluations of veteran sources, new sources, unlikely sources, and potential sources is a task to which judges and courts are unsuited, and section 403(d)(3) gives us no reason to think otherwise.

Fifth, we reject Fitzgibbon's contention that the District Court was under an obligation to consider the effect of the passage of time on the documents in question. As our discussion above establishes, the Supreme Court in *Sims* made it clear that Congress intended intelligence sources and methods to be protected, and that the Director of Central Intelligence is charged with that function. Our discussion above also establishes that maintaining the confidentiality of intelligence sources' identities has two purposes: protection of persons or entities that are or have been sources, and insurance (or inducement) both for current sources to remain so and future, potential sources to become sources. Thus, " '[t]he Government has a compelling interest in

protecting both the secrecy of information important to our national security and *the appearance of confidentiality* so essential to the effective operation of our foreign intelligence service.'" *Sims*, 471 U.S. at 175, 105 S.Ct. at 1891 (emphasis supplied) (quoting *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (*per curiam*)). The appearance of confidentiality would hardly be enhanced if sources and future sources were to learn that their safety—and often their lives—were to depend upon judicial oversight.

In its earlier rulings requiring disclosure, the District Court apparently imported the exemption 1 standards for national security protection into exemption 3. Exemption 1 allows, under certain circumstances, the disclosure of "old" national security information. *See Fitzgibbon*, 578 F.Supp. at 716–21; *id.* at 721 ("In this effort [to determine whether an "individual, if he or she is still alive, might be embarrassed or harmed by revelation"], the Court has in the main followed the rationale of [a recent executive order], in that it has presumed that an individual who imparted information to the CIA over 20 years ago is not a source whose revelation would damage national security today."). Our prior decisions have not been entirely consistent as to whether the scope of exemption 3 in the context of section 403(d)(3) and section 403(g)[4] is equal to or broader than the scope of exemption 1. *Compare Ray v. Turner*, 587 F.2d 1187, 1196 (D.C.Cir.1978) (equal to exemption 1), *with Baker v. CIA*, 580 F.2d 664, 668–69 (D.C.Cir.1978) (under section 403(g), exemption 3 broader than exemption 1), *and Hayden v. NSA*, 608 F.2d 1381, 1390 (D.C.Cir.1979) (under National Security Agency's exemption 3 statute, 50 U.S.C. § 402, exemption 3 to be construed more broadly than exemption 1). Given the Supreme Court's sweeping language in *Sims* and the fact that these exemption statutes were congressionally designed to shield processes at the very core of the intelligence agencies—intelligence-collection and intelligence-source evaluation—we must conclude that the importation of standards into the exemption 3 analysis from the exemption 1 analysis is improper, at least insofar as the latter analysis could be read to require the court to consider the effect of the passage of time on materials withheld under exemption 3.

For these reasons, we conclude that the District Court correctly applied *Sims* and correctly construed section 403(d)(3) and exemption 3 in its consideration of Fitzgibbon's claims. This conclusion disposes of Fitzgibbon's claims on appeal.

## B. *Disclosure of Domestic Intelligence Sources*

■ As we discussed earlier, the District Court ordered the release of all information concerning domestic sources and contacts on the ground that use of domestic sources falls outside the CIA's congressional mandate to conduct foreign intelligence. We conclude that the District Court erred on this point and that the CIA may withhold domestic sources as it would foreign sources.

The District Court is certainly correct in asserting that the CIA has no internal security or law enforcement functions, but the District Court erred in concluding from this observation that CIA contacts with domestic officers and agencies are beyond the CIA's mandate to conduct foreign intelligence. *See* Mem.Op. of 19 May 1989 at 15, JA at 1330. The fact that the Agency has no domestic intelligence role is entirely harmonious with the rather pedestrian observation that the Agency must, at times, pursue domestically its foreign intelligence mandate. As the Supreme Court noted in *Sims*, a vast amount of intelligence material is derived from domestic sources, *Sims*, 471 U.S. at 171, 105 S.Ct. at 1888, and *Sims*

---

**4.** Section 7, 50 U.S.C. § 403(g), provides in relevant part:

In the interests of the security of the foreign intelligence activities of the United States and in order further to implement the proviso of section 403(d)(3) ... the Agency shall be exempted from the provisions of section 654 of Title 5, and the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency....

itself actually involved domestic educational institutions and researchers. In its memorandum of 10 November 1983, the District Court stated that the CIA's contacts with the NYPD concerning the papers of the Basque government-in-exile displayed the Agency's "purely domestic role and had nothing to do with the trading of information or the planning and conducting of joint operations between U.S. and foreign intelligence services.... Certainly no New York official or police officer is a foreign intelligence service." *Fitzgibbon,* 578 F.Supp. at 713 & n. 24. Trading information and planning or conducting operations are certainly part of CIA's mandate, but the District Court's arbitrary focus on the foreign intelligence *service* rather than the foreign intelligence *function* cannot stand after *Sims.* Indeed, the District Court's approach could hinder the Agency from discharging its congressionally-mandated function each time that it has to deal with domestic entities such as the FBI or local and state law enforcement agencies. Because the protection of section 403(d)(3) and exemption 3 extends to all intelligence sources, domestic and as well as foreign, the District Court's order requiring disclosure of CIA contacts with domestic sources, agencies and officials is reversed.

## C. *Disclosure of a CIA Station Location*

■ The District Court also ordered disclosure of the location of a particular CIA station because that information was "publicly available" within the meaning of *Afshar v. Department of State,* 702 F.2d 1125, 1133 (D.C.Cir.1983). The District Court's rationale was that the station location had been revealed in a 1975 congressional committee report. *Fitzgibbon,* 578 F.Supp. at 715. We disagree and reverse the District Court's disclosure order on this point.

■ In *Afshar,* we concluded that when information has been "officially acknowledged," its disclosure may be compelled even over an agency's otherwise valid exemption claim. For an item to be "officially acknowledged," however, we established three criteria. First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed; we noted, for example, that official disclosure did not waive the protection to be accorded information that pertained to a later time period. Third, we held that the information requested must already have been made public through an official and documented disclosure. *Afshar,* 702 F.2d at 1133. These criteria are important because they acknowledge the fact that in the arena of intelligence and foreign relations there can be a critical difference between official and unofficial disclosures. *See Abbotts v. Nuclear Regulatory Comm'n,* 766 F.2d 604, 607–08 (D.C.Cir.1985); *Military Audit Project v. Casey,* 656 F.2d 724, 742–45 (D.C.Cir.1981); *Phillippi v. CIA,* 655 F.2d 1325, 1332–33 (D.C.Cir.1981). As the Fourth Circuit has noted, "[i]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 482 (1975). *See also Simmons v. Department of Justice,* 796 F.2d 709, 712 (4th Cir.1986).

The Agency first argues that "a disclosure by a congressional committee does not constitute 'official acknowledgment' by an authorized Executive branch official and cannot bind the Executive Branch," Brief for CIA at 37, relying primarily on *Salisbury v. United States,* 690 F.2d 966, 971 (D.C.Cir.1982), and *Department of the Navy v. Egan,* 484 U.S. 518, 528, 108 S.Ct. 818, 829, 98 L.Ed.2d 918 (1988). A contrary rule, the CIA continues, "would clearly be unconstitutional—both because it clearly interferes with the Executive's authority to control access to national security information, and because it would authorize a congressional entity to perform an executive function." Brief for CIA at 38–39 (citation omitted). As a policy matter, the Agency urges us to conclude that "relying on congressional releases to force the Executive to confirm or deny [the] accuracy and substance of such information may

well pose a risk of compromise of intelligence sources and methods." *Id.* at 39.

The Agency is doubtless correct in arguing that the executive branch has substantial statutory and constitutional discretion to control the flow of national security information, and that executive branch confirmation or denial of information contained in congressional reports could under some circumstances pose a danger to intelligence sources and methods. We decline to reach the constitutional grounds offered by the Agency, however, because we conclude that the District Court misread *Afshar* when it concluded that a disclosure could operate as a waiver of protection for information relating to a time period prior to the events disclosed. As the District Court correctly noted, this Court "stated in *Afshar* that the prior disclosure waiver would not operate on information pertaining to a time period *later* than the date of the publicly documented information." *Fitzgibbon,* 578 F.Supp. at 715 n. 30 (emphasis in original) (citing *Afshar,* 702 F.2d at 1133). The District Court went on to find, however, that "[t]here is no reason grounded in either the past or the present for distinguishing between the documents that the Senate used to confirm a CIA presence in the Dominican Republic in 1960 and 1961 and those in this case that would confirm a presence dated to 1956 ... [because] no greater embarrassment either to the United States or to the Dominican Republic would follow from confirming that the presence encompassed several prior years as well." *Id.*

In ordering disclosure of information predating the congressional disclosure, the District Court essentially performed its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure, hence its "no embarrassment" conclusion. As an initial matter, the central issue here is not embarrassment but a determination of possible harm. The assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts. *See Sims,* 471 U.S. at 174–75, 179, 180, 105 S.Ct. at 1890, 1893; *see also*

*supra* at 762–64. Because courts must accord substantial weight and deference to the affidavits of the CIA, *see supra* at 762, we decline to adopt the abuse-of-discretion review that Fitzgibbon urges upon us.

■ Moreover, the District Court's rationale rests upon an erroneous correlation between the continuity of a regime in a foreign country and the Agency's intelligence requirements, sources, methods and operations. Contrary to the District Court's assumption, a foreign government's internal situation and external relations can change over time, thereby necessitating a change in the CIA's presence and activities within the country, an alteration of the CIA's relationship with the regime or the opposition, or a reassessment of Agency goals. Similarly, we have unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations. *See Abbotts,* 766 F.2d at 608; *Salisbury,* 690 F.2d at 971; *Military Audit Project,* 656 F.2d at 753; *Hayden v. NSA,* 608 F.2d 1381, 1388 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). We conclude, therefore, that the rationale of *Afshar's* prohibition against extending any waiver of protection to items concerning events later than the requested materials is equally applicable to items concerning events earlier than the requested materials. The mere fact that the CIA voluntarily transmitted an official document to a congressional committee does not mean that the Agency can thereby automatically be forced to release any number of other documents. The District Court erred in ordering disclosure of the withheld station location.

## D. *Disclosure of FBI Documents*

■ The District Court ordered the disclosure of two FBI documents. In the first document, the FBI withheld the name of an individual whose name appeared in a report that contained no other information about that individual. The second document concerned a New York publisher named Stan-

ley Ross and events that transpired years before the Galindez affair. The Bureau withheld both of these items under exemption 7(C). See supra n. 2. We conclude that the Bureau was justified in its invocation of exemption 7(C) and therefore reverse the District Court's order.

■ As to the first document, the District Court reasoned that "[t]he bare fact that an individual's name appears in an FBI report in a case as wide-ranging as the Galindez investigation is not sufficiently injurious of his privacy to overcome FOIA's presumption in favor of disclosure." *Fitzgibbon*, 578 F.Supp. at 724. We cannot agree. If anything, the fact that a person's name appears in a Bureau report with no other information could weigh against disclosure in that it would be very difficult for a court to determine with any degree of precision the actual invasion of privacy that would occur from release of the name. It is surely beyond dispute that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Branch v. FBI*, 658 F.Supp. 204, 209 (D.D.C.1987). As we have noted before, persons involved in FBI investigations—even if they are not the subject of the investigation—" 'have a substantial interest in seeing that their participation remains secret.' " *King v. Department of Justice*, 830 F.2d 210, 233 (D.C.Cir.1987) (quoting *Senate of the Commonwealth of Puerto Rico v. Department of Justice*, 823 F.2d 574, 588 (D.C.Cir.1987)). We have said quite recently that "[e]xemption 7(C) takes particular note of the 'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged criminal activity.' " *Dunkelberger v. Department of Justice*, 906 F.2d 779, 781 (D.C.Cir.1990) (quoting *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C.Cir.1984)). Exemption 7(C) requires us to balance the citizen's privacy interest against the public interest in disclosure. *See Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 1483, 103 L.Ed.2d 774 (1989). The individual's privacy interest is quite clear. In determining whether the public interest in the document overcomes that privacy interest, we must be guided by *Reporters Committee*.

In *Reporters Committee*, the Supreme Court held that the Bureau could withhold rap sheets (dossiers of information concerning criminal suspects) from third party inquiries. The Court noted that exemption 7(C) is broader than exemption 6 (the general privacy exemption), *Reporters Committee*, 109 S.Ct. at 1472–73 & n. 9, and it rejected as a "cramped notion of personal privacy," *id.* at 1476, the requesters' argument that because some of the information in the rap sheets had been publicly available at an earlier date, the individual's privacy interest in preventing disclosure had diminished. The Court also noted that "portions of the FOIA itself bolster the conclusion that disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind." *Id.* at 1477.

In considering the public interest at stake here, we bear in mind " 'the basic purpose of the Freedom of Information Act "to open agency action to the light of public scrutiny." ' " *Id.* at 1481 (quoting *Department of the Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976)). In *Reporters Committee*, the Supreme Court proceeded to elaborate its definition of FOIA's goal:

> Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct.

*Id.* In order to fulfill this statutory purpose, the Court held

as a categorical matter that a third party's request for law-enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is "unwarranted."

*Id.* 109 S.Ct. at 1485.

In the case before us the privacy interest is substantial. Contrary to Fitzgibbon's assertion, however, there is no reasonably conceivable way in which the release of the one individual's name in the first FBI document, or the release of supplementary data about Ross in the second document—information concerning Ross years before the Galindez affair—would allow citizens to know "what their government is up to." *Id.* at 1481. With the exception of the one name, the first document was disclosed in its entirety, and the additional disclosure of the name would not further enlighten the public concerning the course, scope or purposes of the FBI's investigation.

Similarly, the second document, containing information concerning Ross years before the Galindez affair, would invade Ross's privacy without any substantial countervailing benefit. Fitzgibbon argues that "Ross was a prominent figure in the Galindez investigation," Reply Brief for Fitzgibbon at 19–20, but neither that observation nor the fact that CIA or FBI may have released information about Ross elsewhere causes Ross's substantial privacy interests under exemption 7(C) to be diminished, even after the passage of time. We conclude, therefore, that "[t]he simple fact is that those records say nothing of significance about 'what the[ ] Government is up to.' ... We need not linger over the balance; something ... outweighs nothing every time." *NARFE v. Horner*, 879 F.2d 873, 879 (D.C.Cir.1989), *cert. denied sub nom. NARFE v. Newman*, — U.S. ——, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).

## IV. CONCLUSION

For the foregoing reasons, we conclude the CIA and the FBI prevail both as appellees and cross-appellants. We therefore affirm in part, reverse in part, and remand to the District Court with instructions to dismiss.